**DEERING MILLIKEN, INC., UNITY PLANT, Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and F. Ray Marshall, Secretary of Labor U.S. Department of Labor, Respondents.**

No. 79–1212.

United States Court of Appeals, Fifth Circuit.

Nov. 19, 1980.

Thompson, Mann & Hutson, Gary S. Klein, Washington, D.C., Robert T. Thompson, Carl B. Carruth, Greenville, S.C., for petitioner.

Morton Hollander, Director, Appellate Staff, Civ. Div., U.S. Dept. of Justice,

Washington, D.C., Marleigh Dover Lang, Ronald R. Glancz, Lorelei Joy Borland, Dennis K. Kade, U.S. Dept. of Labor, Washington, D.C., for respondents.

Before BROWN, TJOFLAT and GARZA, Circuit Judges.

TJOFLAT, Circuit Judge:

Deering Milliken, a corporation engaged in the manufacturing of textiles, has filed this petition, pursuant to § 11(a) of the Occupational Safety and Health Act (OSHA), 29 U.S.C. § 660(a) (1976), for review of an order of the Occupational Safety and Health Review Commission finding petitioner in non–serious violation of a number of provisions of 29 C.F.R. § 1910.1000 (1979).[1] We affirm the decision of the Commission.

I

The Occupational Safety and Health Act of 1970 was passed "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources ...." 29 U.S.C. § 651(b) (1976). In section 6(b) of OSHA, 29 U.S.C. § 655(b) (1976), Congress delegated to the Secretary of Labor the power to promulgate rules to achieve the goals of OSHA. Rules promulgated pursuant to 6(b) were made subject to a notice and comment procedure designed to extend due process safeguards to those potentially affected by them. 29 U.S.C. § 655(b) (1976). Because Congress perceived the industrial safety problem to be severe, however, it provided for an abbreviated procedure, described in section 6(a),[2] for summary promulgation of safety standards. Section 6(a) commands that

[w]ithout regard to [the Administrative Procedure Act] or to the other subsections of this section, the Secretary shall, as soon as practicable ... by rule promulgate as an occupational safety or health standard any national consensus standard, and any established Federal standard, unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees.

29 U.S.C. § 655(a) (1976).

The legislative history of OSHA provides some insight into this summary procedure:

The purpose of this procedure is to establish as rapidly as possible national occupational safety and health standards with which industry is familiar. These standards may not be as effective or as up–to–date as is desirable, but they will be useful for immediately providing a nationwide minimum level of health and safety.... Since, by the Act's definition, a "consensus standard" is one which has been adopted under procedures which have given diverse views an opportunity to be considered and which indicate that interested and affected persons have reached substantial agreement on its adoption, it is appropriate to permit the Secretary to promulgate such standards without regard to the provisions of the Administrative Procedure Act.

The bill also provides for the issuance in similar fashion of those standards which have been issued under other Federal statutes and which under this act may be made applicable to additional employees who are not under the protection of such other Federal laws. Such standards have already been subjected to the procedural scrutiny mandated by the law under which they were issued ....

S.Rep. No. 91–1282, 91st Cong., 2d Sess., 6, *reprinted in* [1970] U.S. Code Cong. & Adm. News, pp. 5177, 5182.

---

1. These regulations were promulgated by the Secretary of Labor to implement OSHA mandates; at the time of petitioner's citation the regulations were designated 29 C.F.R. § 1910.-93.

2. The powers granted the Secretary of Labor in section 6(a) were of limited duration; they expired by their own terms on April 28, 1973. 29 U.S.C. § 655(a) (1976).

On May 29, 1971, acting pursuant to section 6(a), the Secretary of Labor promulgated 29 C.F.R. § 1910.1000 as an OSHA requirement.[3] This regulation, dealing with permissible levels of exposure to air contaminants including cotton dust, was based upon 41 C.F.R. § 50–204.50, an established Federal standard under the Walsh–Healey Public Contracts Act.[4] Subsequently, on August 13, 1971, the Secretary published a revision of 29 C.F.R. § 1910.1000, stating that "Section 1910.93 (air–contaminants) [presently designated as 29 C.F.R. § 1910.-1000. See n.1 supra at 1096] has been revised in its entirety, in the interest of greater intelligibility and accuracy." 36 Fed.Reg. 15101 (August 13, 1971). This revision was achieved pursuant to section 6(a), and thus without regard to the Administrative Procedure Act or to the notice and comment procedures of section 6(b) of OSHA.

On February 25 and 26, 1975, an OSHA compliance officer inspected Deering Milliken's Unity Plant in LaGrange, Georgia. Based upon the findings of this compliance officer, the Secretary of Labor cited petitioner for several nonserious violations of 29 C.F.R. 1910.1000, as finally promulgated. Specifically, the Secretary cited petitioner for failure to use respiratory equipment to protect employees from exposure to raw cotton dust exceeding the mandated exposure limit, see 29 C.F.R. § 1910.1000(a)(2) (1979), and for failure to use feasible administrative or engineering controls to protect employees from excessive exposure to raw cotton dust, see 29 C.F.R. § 1910.-1000(e) (1979). Record, vol. 1 at 1.[5]

Petitioner contested this citation before an administrative law judge, who upheld its validity. On appeal, the Occupational Safety and Health Review Commission upheld the findings of the administrative law judge, and petitioner then sought review

before this court. On review petitioner renews certain of the objections it raised before the Commission, to wit: (1) Because the Secretary of Labor failed to comply with certain conditions of OSHA section 6(b), his modifications of the pertinent regulations were improper, and thus those regulations are entirely invalid. (2) The regulations as interpreted and applied fail to give adequate notice of what compliance entails, and thus are unenforcibly vague.

## II

◼ Petitioner first claims that the Secretary's alleged procedural error renders the citation invalid. While section 6(a) of OSHA provides for summary promulgation of occupational safety and health standards based on any national consensus or established federal standard, any *modification* of an occupational safety and health standard must be achieved through compliance with the notice and comment procedure of section 6(b). *See* U.S.C. § 655(b)(2) (1976). Petitioner argues that by proposing the revisions of 29 C.F.R. § 1910.1000 on August 13, 1971, *see supra* at 1097, the Secretary modified what otherwise would have been a validly promulgated, pre–existing federal standard. Because the regulations as finally adopted were, in petitioner's eyes, substantially different from the pre–existing Walsh–Healey standards upon which they were based, their promulgation required compliance with section 6(b). The Secretary responds to this attack by asserting that petitioner should be barred from offering this objection now because it failed to contest the procedural adequacy of the Secretary's action under OSHA's pre–enforcement review provision, section 6(f). 29 U.S.C. § 655(f) (1976). Thus, we are presented with the threshold question of whether section 6(f) of OSHA is the exclusive vehicle for contesting the procedural

---

3. 36 Fed.Reg. 10466–10467, 10503 (May 29, 1971). (Originally 29 C.F.R. § 1910.93).

4. 41 U.S.C. §§ 35 45 (1976).

5. Deering Milliken's citation also included a count for violation of a noise standard. 29

C.F.R. § 1910.95 (1979). This matter was resolved prior to the administrative hearing on the other alleged violations, and is not relevant to this appeal. *See* Brief for Respondent n. 3 at 3.

validity of regulations promulgated under section 6(a).

## A.

Section 6(f) states in pertinent part:

Any person who may be adversely affected by a standard issued under this section may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard.

29 U.S.C. § 655(f) (1976).

Deering Milliken readily acknowledges that it did not use this pre–enforcement procedure to contest the procedural validity of 29 C.F.R. § 1910.1000. The Secretary, relying upon *National Industrial Constructors, Inc. v. OSHRC*, 583 F.2d 1048 (8th Cir. 1978), asserts that this failure on the part of Deering Milliken necessarily bars petitioner from asserting its argument here. *See also A.F.L.–C.I.O. v. Brennan*, 530 F.2d 109, n.5 at 112 (3d Cir. 1975).

In *National Industrial Constructors*, a corporation claimed that certain regulations issued pursuant to section 6(a) of OSHA were invalidly promulgated. The corporation had not raised this issue in a 6(f) proceeding. Under these circumstances, the Eighth Circuit held the procedural attack on the regulation inappropriate. To achieve this result, the court distinguished substantive and procedural attacks on the validity of regulations issued under section 6(a). Thus, while "at least for substantive

attacks, Congress did not intend pre–enforcement review under Section 6(f) to be the exclusive method for challenging the validity of a regulation," *National Industrial Constructors*, 583 F.2d at 1052, "a challenge to the validity of an OSHA regulation, based solely upon the Secretary's failure to comply with the procedural requirements of the APA, OSHA, or any other applicable statute, may only be raised in a pre–enforcement proceeding instituted pursuant to Section 6(f) of OSHA.... Such attacks may not be raised in an enforcement proceeding." *Id.* at 1052–53.

The Eighth Circuit did not indicate any legislative authority for the distinction it drew between procedural and substantive attacks on section 6(a) regulations[6], but rather relied upon what it felt to be controlling policy considerations:

While the unreasonableness of a regulation may only become apparent after a period during which an employer has made a good faith effort to comply, procedural irregularities need not await the test of time and can be raised immediately. The agency's interest in finality, coupled with the burden of continuous procedural challenges raised whenever an agency attempts to enforce a regulation, dictates against providing a perpetual forum in which the Secretary's procedural irregularities may be raised. Were there no limitation upon the time within which procedural attacks could be made, the resulting uncertainty might inhibit employers, otherwise able and willing, from complying with a regulation.

---

**6.** The Eighth Circuit, however, did place some reliance on a Third Circuit decision, *Atlantic & Gulf Stevedores v. OSHRC*, 534 F.2d 541 (3d Cir. 1976), which purportedly *intimates, see National Industrial Constructors*, 583 F.2d at 1052, that procedural attacks on section 6(a) regulations are improperly raised in an enforcement proceeding. In that same case, however, the Third Circuit stated: "Because we do not believe that Congress intended to foreclose all possible challenge to the validity of a standard 60 days beyond its effective date, we must conclude that § 11(a) of OSHA empowers the Commission to deny enforcement to a standard determined by it to have been issued in viola-

tion of the Act's [OSHA's] substantive or *procedural* requirements." 534 F.2d at 550 (emphasis added). Although later in the opinion the Third Circuit employs language that casts doubt on the solidity of the above quoted statement, 534 F.2d at 551–52, *see also National Industrial Sand Association v. Marshall*, 601 F.2d 689, 700 n.36 (3d Cir. 1979), we feel the first statement is too emphatic to ignore, and thus read the case as supporting procedural attacks on section 6(a) regulations in enforcement proceedings. *See Noblecraft Industries, Inc. v. Secretary of Labor*, 614 F.2d 199, 202 (9th Cir. 1980) for a similar reading of *Atlantic & Gulf Stevedores*.

*National Industrial Constructors*, 583 F.2d at 1052.

Although there is merit in the Eighth Circuit's approach, we find the legislative history of the Act, read in light of the prevailing consensus on the availability of judicial review of agency action, to indicate the contrary result.

This Circuit has consistently held that "[a] long–standing and strong presumption exists that action taken by a federal agency is reviewable in federal court." *Save The Bay, Inc. v. Administrator of EPA*, 556 F.2d 1282, 1293 (5th Cir. 1977). "A statute must demonstrate clear and convincing evidence of an intent to preclude judicial review before courts will cut off an aggrieved party's right to be heard." *Gallo v. Mathews*, 538 F.2d 1148, 1151 (5th Cir. 1976). *See Consolidated–Tomoka Land Company v. Butz*, 498 F.2d 1208, 1209 (5th Cir. 1974). This position is consistent with the Supreme Court's mandate in *Abbot Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967): "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."

Section 6(f) is silent concerning its preclusive effect on post pre–enforcement judicial review of section 6(a) regulations. Moreover, the legislative history indicates that "[w]hile [section 6(f)] would be the exclusive method for obtaining pre–enforcement judicial review of a standard, the provision does not foreclose an employer from challenging the validity of a standard during an enforcement proceeding." S.Rep. No. 91–1282, 91st Cong., 2d Sess., 8, *reprinted in* [1970] U.S. Code Cong. & Ad. News, pp. 5177, 5184. Mindful that the Supreme Court wishes us to locate a *clear command* before limiting judicial review, *see Barlow v. Collins*, 397 U.S. 159, 167, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970), we simply cannot justify finding that the pre–enforcement review provisions of section 6(f) bar petitioner's procedural attack.

We are aware, while following this path, that the Ninth Circuit has reached the same conclusion. *See Marshall v. Union Oil Co. of California*, 616 F.2d 1113, 1117–1118 (9th Cir. 1980); *Noblecraft Industries, Inc. v. Secretary of Labor*, 614 F.2d 199, 201–202 (9th Cir. 1980). Indeed, the Ninth Circuit has discussed a practical consideration that we wish to reiterate. Many regulations were promulgated summarily through section 6(a). *See* 29 C.F.R. § 1910.1–1910.1500 (1979). Industry would have found it quite burdensome to comb through every 6(a) regulation and object to inappropriate promulgations within sixty days, considering the "multitude of regulations [which] could have been promulgated without notice or hearing within two years of the enactment of OSHA." *Union Oil Co. of California*, 616 F.2d at 1118. Surely it was within Congress's power so to mandate, but the record is devoid of references which would support the finding of such an intent. Arguably, industry was lulled by the legislative requirement that all properly promulgated 6(a) regulations would be pre–existing and familiar to industry, *see* S.Rep. No. 91–1282, 91st Cong., 2d Sess., 5–6, *reprinted in* [1970] U.S. Code Cong. & Ad. News, pp. 5177, 5182, and this, combined with the potential number and technical complexity of summarily promulgated regulations, makes it particularly inappropriate to find section 6(f) a bar to procedural attack on 6(a) regulations. In the absence of a statutory scheme clearly indicating a Congressional intent to limit judicial review, we refuse to presume in favor of "administrative absolutism." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 157, 90 S.Ct. 827, 831–832, 25 L.Ed.2d 184 (1970).

### B.

Because petitioner's objections to the promulgation of 29 C.F.R. § 1910.1000 are procedurally proper, we must address those revisions in the Walsh–Healey standard which allegedly support the claim that the Secretary improperly modified the federal standard. We note at the outset that in reviewing "the administrative process, our primary goal should not be to insure 'cor-

rect' decisions, but to preserve the integrity of the decision–making process." *Barnes Freight Line, Inc. v. I.C.C.*, 569 F.2d 912, 923–24 (5th Cir. 1978). Thus, our inquiry is circumscribed about the procedural adequacy of the Secretary's approach to issuing 29 C.F.R. § 1910.1000.

■ The issue we face is whether the Secretary so modified the pre–existing Walsh–Healey air contaminant standards when re–issuing them as OSHA requirements that compliance with the procedural safeguards of section 6(b) was required. We reject outright the contention that the Secretary was required to promulgate existing national consensus or federal standards verbatim. "The Secretary, of course, is entitled to some promulgative leeway in setting standards under the Act." *Marshall v. Pittsburgh–Des Moines Steel Co.*, 584 F.2d 638, 644 (3d Cir. 1978). *But see Usery v. Kennecott Copper Corp.*, 577 F.2d 1113 at 1117 (10th Cir. 1977). Nevertheless, we are quite aware that this promulgative leeway "is narrow where [the Secretary] bypasses rulemaking," *Marshall v. Pittsburgh–Des Moines Steel Co.*, 584 F.2d 638, 644 (3d Cir. 1978), and thus our inquiry is whether a substantively meaningful modification of the Walsh–Healey standard occurred during its transformation into an OSHA requirement.

As originally issued, the regulation in question read:

Section 1910.93—Air Contaminants. (Gases, vapors, fumes, dust, and mists.) (a) Exposures by inhalation . . . to any material or substance (1) at a concentration above those specified in the "Threshold Limit Values of Airborne Contaminants for 1970" of the American Conference of Governmental Industrial Hygienists, listed in Table G–1, . . . shall be avoided, or protective equipment shall be provided and used.

(b) To achieve compliance with paragraph (a) of this section, feasible administrative or engineering controls must first be determined and implemented in all cases. In cases where protective equipment, or protective equipment in addition to other measures is used as the method of protecting the employee, such protection must be approved for each specific application by a competent industrial hygienist or other technically qualified source."

36 Fed.Reg. 10503–504 (May 29, 1971). (This proposed regulation, as previously noted, was based upon the Walsh–Healey standard, 41 C.F.R. § 50–204.50 (1979); it will be referred to hereafter as the Walsh–Healey standard.) After revision "in the interest of greater intelligibility and accuracy" 36 Fed.Reg. 15101 (August 13, 1971), the regulation, as finally promulgated, reads:

Section 1910.1000–Air Contaminants.

An employee's exposure to any material listed in Table Z–1 . . . shall be limited in accordance with the requirements of the following paragraphs of this section.

(a) Table Z–1:

* * * * * *

(2) *Other materials–8–hour time weighted averages.* An employee's exposure to any material in table Z–1 . . . in any 8–hour work shift of a 40–hour work week, shall not exceed the 8–hour time weighted average limit given for that material in the table.

* * * * * *

(e) To achieve compliance with paragraph (a) through (d) of this section, administrative or engineering controls must first be determined and implemented whenever feasible. When such controls are not feasible to achieve full compliance, protective equipment or any other protective measures shall be used to keep the exposure of employees to air contaminants within the limits prescribed in this section. Any equipment and/or technical measures used for this purpose must be approved for each particular use by a competent industrial hygienist or other technically qualified person. Whenever respirators are used, their use shall comply with section 1910.134.

29 C.F.R. § 1910.1000 (1979).

Petitioner contends that the regulation as finally promulgated substantively modifies the Walsh–Healy standard in four ways:

(1) By adding the requirement of compliance with section 1910.134 in the last sentence of 1910.1000(e).

(2) By eliminating a choice of compliance methods allegedly available under the Walsh–Healey standard by mandating use of administrative or engineering controls.

(3) By changing Walsh–Healey's allegedly advisory guideline levels of air contaminants to mandatory exposure limits.

(4) By requiring, pursuant to the Secretary's interpretation, compliance with a different Threshold Limit Value than that contemplated by the original Walsh–Healey standard.

For the reasons discussed below, we find each of these contentions devoid of merit.

■ The Walsh–Healey standard did not mandate compliance with section 1910.134, and thus superficially petitioner's claim appears colorable. Section 1910.134, however, was proposed pursuant to section 6(a) of OSHA at the same time that the original, unrevised section 1910.1000 was proposed. 36 Fed.Reg. 10466–10467 (May 29, 1971). Soon thereafter, section 1910.134 became a legally binding OSHA regulation; from that time petitioner was bound to comply with its directives. By revising 1910.1000(e) to include a cross reference to 1910.134, the Secretary was merely highlighting an independently efficacious OSHA regulation–its addition clarified petitioner's duty while adding no new obligation. Whether or not 1910.1000(e) cross referenced 1910.134, petitioner was bound to meet its requirements. Beyond petitioner's contention, we have investigated the correlation between 1910.134 and the national consensus standard from which it was derived, American National Standard Practices for Respiratory Protection, ANSI Z88.2–1969 (1969), and find that in promulgating 1910.134 the Secretary did not materially alter that standard's provisions. Thus, by incorporating 1910.134, section 1910.1000 was adopting neither a new nor improperly promulgated regulation under 6(a).

■ Petitioner also contends that section 1910.1000 eliminates a choice among compliance options previously available under Walsh–Healey. Walsh–Healey, it argues, provided that Threshold Limit Values of exposure "shall be avoided, *or* protective equipment shall be provided and used" (emphasis added). This disjunctive purportedly extended petitioner a choice in method of compliance. Petitioner juxtaposes this supposed choice with the requirement of section 1910.1000(e) that "[w]hen such [administrative or engineering] controls are not feasible to achieve full compliance, protective equipment . . . shall be used." Supposedly, Walsh–Healey provided for elimination of air contaminants either through administrative and engineering means or through the use of protective equipment, while section 1910.1000 mandates use of administrative and engineering controls, only providing for the use of protection equipment when exposure limits may not be attained otherwise. This is simply an incorrect reading of the clear language of the regulations.

Walsh–Healey commanded that exposure to air contaminants above a certain level "shall be avoided"—clear, mandatory language requiring full compliance with specified exposure limits. Walsh–Healey went on to state: "To achieve compliance with paragraph (a) of this section [exposure limits], feasible administrative or engineering controls *must* first be determined and implemented in *all* cases." (Emphasis added.) *See supra,* at 1099–1100. Thus, feasible engineering and administrative controls were mandatory under Walsh–Healey; protective equipment, when used, was not a substitute for feasible alternative means of air contaminant control, but rather a means of compliance available when engineering or administrative controls were infeasible, or only partially effective. Thus, Walsh–Healey parallels the present requirements of section 1910.1000(e): "To achieve compliance with paragraph (a) . . . administrative or engineering controls must first be determined and implemented whenever feasible. When such controls are not feasible to achieve full compliance, protective equipment . . . shall be used. . . ."

Petitioner next contends that section 1910.1000 transformed advisory guidelines under Walsh–Healey into mandatory exposure limits. Walsh–Healey specifically provided that "[e]xposures by inhalation to any material or substance (1) at a concentration above those specified in the 'Threshold Limit Values of Airborne Contaminants for 1970' . . . *shall be avoided* . . . ." (Emphasis added.) *See supra* at 1100. Section 1910.-1000(a)(2) provides simply that an employee's exposure to air contaminants "*shall not exceed*" the specified Threshold Limit Values (values identical to those under Walsh–Healey) (emphasis added). The language of both regulations is clearly mandatory. Whether the Threshold Limit Values mandated by Walsh–Healey were only advisory when originally established by the American Conference of Governmental Industrial Hygienists (see Brief for Petitioner at 20–21) is irrelevant; Walsh–Healey incorporated those values as mandatory exposure limits, and maintenance of their mandatory character through promulgation of section 1910.1000 was not a modification of the pre–existing Walsh–Healey standard.

▪ Petitioner's final attack on the procedural validity of section 1910.1000 rests upon the Secretary's interpretative application of the cotton dust exposure standard. Petitioner asserts that this interpretation effectively modifies the underlying federal standard.

In enforcing the mandatory exposure limits of section 1910.1000, OSHA decided to use personal dust samplers to measure the concentration of cotton dust in the air of textile plants. Record Excerpts at 41. Personal samplers are dust collection devices worn by individual employees; OSHA's decision to use them in enforcing section 1910.1000 was premised upon a determination, supported by evidence in the record, that they most adequately measured employee exposure to cotton dust. Furthermore, the record indicates that OSHA had reason to believe that personal samplers represented the best available sampling method. *Id.*, Record, vol. 7 at 783. The Threshold Limit Values incorporated

by section 1910.1000 from Walsh–Healey, however, were based upon a study conducted by Drs. Roach and Schilling using area sampling techniques. *See* Roach & Schilling, *A Clinical and Environmental Study of Byssinosis in the Lancashire Cotton Industry*, 17 *Brit. J. Indus. Med.* 1 (1960). *See also* Record Excerpts at 8, 32. Area sampling measures general air concentrations of cotton dust rather than individual exposure to cotton dust. The Secretary admits that area samplers collect dust differently than do personal samplers. Petitioner asserts that it is inappropriate to enforce a standard originally set through reliance on a particular measuring technique–here, area samplers–by use of devices–personal samplers–which do not have a directly corresponding measurement capacity. The use of different measuring devices, it is argued, in effect creates a different set of exposure limits than those originally contemplated under Walsh–Healey. Petitioner cites *Marshall v. Pittsburgh–Des Moines Steel Co.*, 584 F.2d 638 (3d Cir. 1978) and *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113 (10th Cir. 1977) to support this proposition.

In *Kennecott Copper*, the Secretary of Labor used the 6(a) procedure to promulgate certain OSHA standards regarding guard rails on scaffolding. In issuing this regulation, however, the Secretary altered the advisory language of the underlying American National Standards guidelines, thus creating an affirmative duty on the part of employers to comply with its standards. 577 F.2d at 1116–1117. This, the court reasoned, constituted a modification of the pre–existing national standard and therefore was not properly achieved through 6(a). The Secretary had used the summary procedure to promulgate a mandatory requirement which had hitherto been merely an advisory guideline within the industry in question; promulgations of this sort, requiring greater compliance than could reasonably have been anticipated by industry, demand compliance with section 6(b). 577 F.2d 1117–1118.

The *Marshall v. Pittsburgh–Des Moines Steel Co.* court relied upon *Kennecott Cop-*

*per* to invalidate an OSHA regulation. In *Pittsburgh–Des Moines*, the Secretary had interpreted a certain regulation to be mandatory. The court found, however, that the national consensus standard upon which this OSHA regulation was based was merely advisory. Thus, the court reasoned that the Secretary's insistence upon interpreting the regulation to create a duty was inconsistent with his limited authority under 6(a). "We perceive no difference between the Secretary's change of wording, disapproved in *Kennecott Copper*, and his change in interpretation, confronting us here." 584 F.2d at 644. Petitioner would have us read these cases together to invalidate the Secretary's interpretative application of section 1910.1000.

While petitioner's theory is well taken, the practical ramifications of the Secretary's choice of samplers in enforcing section 1910.1000 belie petitioner's contentions. The record clearly indicates, and petitioner does not contest, that personal samplers collect 20% *less* dust than area samplers do. Record, vol. 6 at 752, Record Excerpts at 32, 45. Thus, petitioner would have us rely on cases invalidating agency action under 6(a) that increased a pre–existing obligation of industry, to invalidate agency action under 6(a) that measurably *decreases* industry's obligation. It is clear, however, that petitioner would be in violation of section 1910.-1000 regardless of which method of measurement was used. Petitioner's objection is thus frivolous.

### III

Having determined that section 1910.1000 was properly promulgated under 6(a), we proceed to examine petitioner's claim that the regulation as interpreted and applied is unenforceably vague.

Petitioner contends that the exposure levels of "cotton dust (raw)" specified in section 1910.1000 are, by that very denomination, concerned solely with dust emanating from cotton. The Secretary has, however, steadfastly maintained that the cotton dust subject to curtailment under section 1910.-1000 is comprised of all dust particles arising from the processing of cotton. This would include such attendant dusts as those from burlap bags and twigs. *See Spring Air Mattress Co.* [CCH] 1974–75 OSHD ¶ 19,146. (Secretary contends that ordinary dirt associated with cotton bales is raw cotton dust for purposes of the exposure limit.) The standard does not, according to petitioner, give industry fair warning of the potential validity of such an interpretation, and thus is irreparably vague.

■ In considering petitioner's claims, we are guided by the precedent of this Circuit:

> In considering the claimed vagueness of the regulation, we are mindful of two critical factors: first, this regulation involves remedial civil legislation in contradistinction to criminal legislation; secondly, the rights guaranteed by the First Amendment are not remotely related to this case. Hence, we must consider the [regulation] "not only in terms of the statute 'on its face' but also in light of the conduct to which it is applied." ...
> So long as the mandate affords a reasonable warning of the proscribed conduct in light of common understanding and practices, it will pass ... muster.

*Ryder Truck Lines v. Brennan*, 497 F.2d 230, 233 (5th Cir. 1974) (citations omitted). We believe that the cotton dust standard, as enunciated in section 1910.1000, and as applied by the Secretary, gave reasonable warning to petitioner of what the regulation demanded. This is particularly true in light of the common understanding of the purpose behind OSHA regulation of air contaminants in the textile industry.

■ Initially, we must note that the Secretary of Labor had, previous to citing petitioner, sought to enforce section 1910.1000 on the basis of the total dust arising from the processing of cotton. *See Spring Air Mattress Co.* [CCH] 1974–75 OSHD ¶ 19,146. Although the Occupational Safety and Health Review Commission rebuffed the Secretary, the refusal to embrace the Secretary's application of the standard was not a decision on the merits, but rather one based only on the Secretary's failure to offer evi-

dence supporting his reading of the cotton dust standard. *Id.* at 22,872. ("At the hearing [the Secretary] theorized that ordinary dirt associated with cotton bales is raw cotton dust for the purposes of the standard. . . . No evidence was adduced to support the theory. *In the circumstances, we cannot say that they are the same.*" (Emphasis added.)) Thus, petitioner should have been on notice of the Secretary's enforcement position, and should have been aware that the Secretary might well continue to pursue that position in the future. Whether or not petitioner was cognizant of the Secretary's position, however, the record indicates that petitioner's own expert witness testified that he was aware that the standard required by section 1910.1000 was to be read as a total dust standard. Record, vol. 5 at 561. Record Excerpts at 8, 39.

Especially persuasive, however, is the legislative understanding providing the foundation for the Secretary's promulgation of section 1910.1000. When enacting OSHA, Congress, to emphasize what it deemed to be the magnitude of the industrial safety problem, discussed several quite noticeable and troublesome occupationally related health disorders. One of the disorders which Congress chose to focus upon was byssinosis ("brown lung"), the lung disease most often associated with employment in the textile industry:

> Studies of particular industries provide specific emphasis regarding the magnitude of the [industrial health] problem. For example, despite repeated warnings over the years from other countries that their cotton workers suffered from lung disease, it is only within the past decade that we have recognized byssinosis as a distinct occupational disease among workers in American cotton mills. Recent studies now show that this illness, *caused by the dust generated in the processing of cotton*, and resulting in continuous shortness of breath, chronic cough and total disablement, affects substantial percentages of cotton textile workers.

S.Rep. No. 91–1282, 91st Cong., 2d Sess., 3, *reprinted in* [1970] U.S. Code Cong. & Ad. News, pp. 5177, 5179 (emphasis added). It is clear, therefore, that Congress was aware of the health implications of exposure to all the dust generated by cotton processing and had that very problem in mind when passing OSHA.

Certainly the correlation between what is now termed byssinosis and the dust associated with the processing of cotton has been commonly known for several hundred years. *See A.F.L.–C.I.O. v. Marshall*, 617 F.2d 636, n.11 at 644–45 (D.C. Cir. 1979) *cert. granted,* —— U.S. ——–——, 101 S.Ct. 68, 66 L.Ed.2d 19 (1980), quoting from B. Ramazzini, *A Treatise of The Diseases of Tradesmen* (London, 1705). Yet, "[a]lthough the prevalence of the disease among cotton workers has been known for centuries, its exact etiology is still not completely understood. . . . [V]ariations in the composition of cotton dust [has] compounded the uncertainties about the actual way in which cotton dust exposure causes serious health impairments." *A.F.L.–C.I.O. v. Marshall*, 617 F.2d 644–45 (footnotes omitted). Faced with this Congressionally recognized correlation and the scientific uncertainties surrounding the exact cause of byssinosis, the Secretary sought to implement the will of Congress through promulgation of a pre–existing federal standard dealing with exposure to cotton dust. The history of that standard sheds light on the invalidity of petitioner's assertion.

The Walsh–Healey standard, predecessor of section 1910.1000, was, as previously discussed, based directly, upon a study conducted by Drs. Roach and Schilling. *supra,* at 1102. That study used total dust arising from the processing of cotton both to conduct experimental analysis and to set threshold levels of exposure. Record Excerpts at 9, 39. Section 1910.1000's reformulation of the Walsh–Healey standard, therefore, was a promulgation of exposure limits based upon readings of total cotton dust. Given the uncertainty regarding the precise dust components causing byssinosis [7],

---

**7.** Given that uncertainty, we find it quite unreasonable to assume that the regulation should be read as dealing with only a discrete portion of the particles comprising industrial cotton dust.

the Congressional recognition that it was the dust "generated in the processing of cotton" which somehow was to blame, the distinct scientific correlation between measurements of total cotton dust and the incidence of byssinosis, Record at 8–9, 39, and the total dust foundation of the federal standard adopted by the Secretary to fight byssinosis, we find it eminently reasonable and foreseeable that section 1910.1000 would be enforced on the basis of total cotton dust generated by the processing of cotton. If there ever was any vagueness in the wording of the regulation, its history and the legislative intent behind its implementation as an OSHA mandate, coupled with the enforcement posture of the Secretary, dispelled that vagueness and rendered the meaning of section 1910.1000 clear. For these reasons, petitioner's attack based on the vagueness of the regulation must be rejected.

The decision of the Commission is AFFIRMED.

AFFIRMED.