614 F.2d 199
 7 O.S.H. Cas.(BNA) 2059, 1979 O.S.H.D. (CCH) P 24,135
NOBLECRAFT INDUSTRIES, INC., Boise Cascade Corporation,
Continental Kitchens, Inc., Diamond International
Corporation, Louisiana-Pacific Corporation, Konkolville
Lumber Company, Weyerhaeuser Company, Petitioners,
v.
SECRETARY OF LABOR and Occupational and Safety and Health
Review Commission, Respondents.
 Nos. 76-1106, 76-1281, 76-1306, 76-3714, 77-1436, 77-1445
and 77-1611.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 3, 1980.
Rehearing Denied March 10, 1980.
 
 George Tichy, Spokane, Wash., Douglas B. M. Ehlke, Federal Way, Wash., Carolyn J. Purnell, Tacoma, Wash., for petitioners.
 Dennis K. Kade, Atty. Dept. of Labor, Washington, D. C., for respondents.
 On Petition to Review and Set Aside Certain Orders of the Occupational Safety and Health Review Commission.
 Before MERRILL and GOODWIN, Circuit Judges, and SCHNACKE,* district judge.
 MERRILL, Circuit Judge:
 
 
 1
 Petitioners are Pacific Northwest employers engaged in the processing of lumber and the manufacture of wood products. Each was the subject of an enforcement inspection by the Occupational Safety and Health Administration (OSHA), and was cited for various violations of safety standards. Each contested the citations and in each case the citations (with the exception of certain of the citations for noise level violations) were upheld by order of the Occupational Safety and Health Review Commission (OSHRC). Under the Occupational Safety and Health Act (the Act), 29 U.S.C. § 660(a), each petitioner now seeks review by this court of the Commission order affecting it to the end that that order be set aside. The petitions for review have been consolidated in this proceeding.
 
 Radial Saw Violations
 
 2
 Many of the citations issued by OSHA had to do with the manner in which petitioners utilized industrial size radial arm saws in their manufacturing and processing operations. OSHA contends that the manner of operation in each case is contrary to the safety standards established by the OSHA regulation contained in 29 C.F.R. § 1910.213(h)(1).[1] That standard reads in part as follows:
 
 
 3
 "The sides of the lower exposed portion of the blade shall be guarded to the full diameter of the blade by a device that will automatically adjust itself to the thickness of the stock and remain in contact with stock being cut to give maximum protection possible for the operation being performed."
 
 
 4
 The citations were for failure to provide such a device. Throughout these proceedings petitioners have contended that such a device is unsafe and unfeasible.
 
 
 5
 Petitioners offer two challenges to the regulation. First, they contend that the standard from which the regulation was drawn was not a valid "national consensus standard" as required by the statute. Second, they contend that even if the source standard was a valid consensus standard, the Secretary destroyed the consensus by omitting certain portions of the standard in adopting 29 C.F.R. § 1910.213(h).
 
 
 6
 OSHA contends that review of the validity of (h)(1) is time barred by the Act. Section 6(f) of the Act, 29 U.S.C. § 655(f), provides in part:
 
 
 7
 "Any person who may be adversely affected by a standard issued under this section may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard."
 
 
 8
 Legislative history indicates, however, that this limitation was intended to apply only to pre-enforcement review of the standards and that if review of an enforcement order is timely sought under § 660(a), the validity of the standard can be challenged in those proceedings. The Senate Report states:
 
 
 9
 "While (Section 655(f)) would be the exclusive method for obtaining pre-enforcement judicial review of a standard, the provision does not foreclose an employer from challenging the validity of a standard during an enforcement proceeding."
 
 
 10
 S.Rep.No.91-1282, 91st Cong., 2d Sess., Reprinted in (1970) U.S.Code Cong. & Admin.News pp. 5177, 5184. The Conference Report merely states that "a 60-day limitation on the appeal time (was) accepted by the conferees." Conf.Rep.No.91-1765, 91st Cong., 2d Sess., Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 5228, 5232.
 
 
 11
 Accordingly, we hold that the limitation provided by § 655(f) applies to pre-enforcement review only, and that the validity of the standard can be challenged in this review of the enforcement order under § 660(a). We read Atlantic & Gulf Stevedores v. OSHRC, 534 F.2d 541 (3d Cir. 1976), as holding to this effect.
 
 
 12
 Petitioners first challenge the regulation as not adopted pursuant to statutory authority. The Secretary did not comply with the notice and hearing provisions of the Administrative Procedure Act in adopting the regulation. However, 29 U.S.C. § 655(a) authorizes the Secretary "as soon as practicable" to promulgate any "national consensus standard" as an occupational safety or health standard "without regard to chapter 5 of Title 5." OSHA contends that the standard here in question qualifies as a national consensus standard. That term is defined in § 3(9) of the Act, 29 U.S.C. § 652(9), as follows:
 
 
 13
 "The term 'national consensus standard' means any occupational safety and health standard or modification thereof which (1) has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has been designated as such a standard by the Secretary, after consultation with other appropriate Federal agencies."
 
 
 14
 The regulation, 1910.213(h)(1), is taken from standards adopted by the American National Standards Institute (ANSI). Legislative history indicates that Congress was satisfied that the procedures customarily followed by ANSI were such that ANSI standards would meet the statutory definition of national consensus standards. The Senate Report states:
 
 
 15
 "Two private organizations are the major sources of consensus standards: the American National Standards Institute, Inc., and the National Fire Protection Association. Since, by the Act's definition, a 'consensus standard' is one which has been adopted under procedures which have given diverse views an opportunity to be considered and which indicate that interested and affected persons have reached substantial agreement on its adoption, it is appropriate to permit the Secretary to promulgate such standards without regard to the provisions of the Administrative Procedure Act."
 
 
 16
 S.Rep.No.91-1282, 91st Cong., 2d Sess., Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 5177, 5182. Senator Javitts, a leading proponent of the Act, agreed that "a national consensus standard, under this Act, is a standard which has been developed by one of two organizations at the present time: the American National Standards Institute or the Fire Underwriters Association." Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 91st Cong., 2d Sess., Legislative History of the Occupational Safety and Health Act of 1970, at 504 (1970).
 
 
 17
 For several reasons petitioners contend that the challenged standard, 1910.213(h)(1), was not properly adopted as a consensus standard pursuant to § 652(9). Petitioners argue that the requirements of § 652(9) were not met because the sawmill and plywood industries were not represented on the ANSI committee which formulated the standard.[2] However, the National Lumber Manufacturers Association was represented on the committee, as was the National Safety Council, of which appellant Weyerhaeuser was a member. Petitioners further argue that the ANSI standards were not valid consensus standards because the individual employers who composed the ANSI member organizations were not consulted or required to reach consensus with regard to the standards. Congress, however, was aware of ANSI's procedures, and approved the adoption of ANSI standards as national consensus standards.
 
 
 18
 Petitioners also contend that the ANSI source standard was intended only as a guide and that no consensus can be said to have been reached to the effect that the standards should be literally enforced in all cases. ANSI standards generally are stated to be guides, however, and this fact did not discourage congressional approval of the ANSI procedures.[3] The same can be said of petitioners' complaint that the Secretary adopted the ANSI standards here involved as meeting the requirements of consensus standards without conducting his own investigation as to whether the statutory definition had been met.
 
 
 19
 The resort by Congress to consensus standards was to meet the pressing need for adoption of OSHA standards on an exceedingly broad industrial front without undue delay. The procedures by which consensus standards were formulated were felt to provide sufficient assurance as to industry-wide consensus to justify exempting such standards from the requirements of the APA. Protection against misguided or inappropriate application of a particular standard is afforded by the Act's provisions for modification of standards under 29 U.S.C. § 655(b), should experience indicate that safety could better be achieved by other means, and for variances under 29 U.S.C. § 655(d), where the circumstances surrounding the particular use indicate that other practices will sufficiently achieve safety. In this case no petitioner sought modification or variance as to any of the charged violations.
 
 
 20
 Petitioners contend that Congress improperly delegated legislative and administrative power to a private organization, ANSI. We do not find an undue delegation of power. See Plum Creek Lumber Co. v. Hutton, 608 F.2d 1283, 1288 (9th Cir., Nov. 26, 1979, at 991). OSHA in practice did not surrender to ANSI all its standard-making function. As was the case here, it selected among the ANSI standards with apparent discrimination.
 
 
 21
 Petitioners' second contention is that even if the ANSI source standard did represent a consensus, that consensus was destroyed when the Secretary omitted certain portions of the source standard in adopting 1910.213(h)(1). The regulation is derived from ANSI's "Safety Code for Woodworking Machinery."[4] The Secretary did not, however, adopt the code in its entirety. A substantial portion was not adopted, and petitioners contend that the deletions so alter that which remains that it cannot meet the definition of a national consensus standard. Emphasis is placed on two eliminated portions: The first is a paragraph defining the scope of the code. It reads:
 
 
 22
 "Scope. This code is intended as a guide for the safe installation, operation, and maintenance of woodworking machinery, including cooperage operations and the making of veneer, but excluding the manufacture of structural plywood. It deals primarily with 'point of operation' hazards on woodworking machinery."
 
 
 23
 The second is a headnote to the division entitled "Woodworking Machinery," in which (h)(1), the section on radial saws, is to be found. That note reads:
 
 
 24
 NOTE: It is recognized that the standards for saw guards in 4.1 are not perfectly applicable to all operations for which saws are used. The standards given are those which woodworkers have agreed are most generally useful. Since there are a considerable number of cases not satisfactorily met by these standards, the enforcing authority should exercise rather wide latitude in allowing the use of other devices which give promise of affording adequate protection. It may be expected that by so doing further progress in saw guarding will be encouraged."
 
 
 25
 Petitioners contend that deletion of the notes served to extend the code into areas it was not intended to cover. OSHA responds that neither the headnote nor the scope note purports to fix safety standards; that both are commentary and have no place in a regulation purporting to set forth what must be done in order to render certain machinery safe. The notes do, however, bear on the scope of the consensus.
 
 
 26
 OSHA correctly observes that the headnote is essentially a direction to the enforcing agency that exemptions should be liberally granted. Since § 655(d) of the Act provides for the granting of variances, adoption of the headnote would have been superfluous.
 
 
 27
 However, from the language of the eliminated notes and from testimony given before the administrative law judges by persons who had participated in the proceedings by which agreement was reached upon the ANSI woodworking standards, it is clear that the standards relative to radial saws were not intended to apply to all uses to which such saws might be put. The standards were intended to apply to woodworking the sort of operation one might find in the shop of a cooper, or carpenter, or cabinetmaker. There was no consensus that the standards should apply to the manufacture of structural plywood or to sawmill operations. If anything, the consensus was that they should not apply to such operations.
 
 
 28
 Giving support to this view is a foreword to the 1954 ANSI code which reads in part:
 
 
 29
 "(In the 1944 revision of the Safety Code for Woodworking Machinery the) scope was changed to exclude the manufacture of structural plywood, which was an overlapping of the American Standard Logging and Sawmill Safety Code, B13-1924. This new code contains a comprehensive revision of the cooperage machinery section and an entirely new section dealing specifically with radial-type saws."
 
 
 30
 Petitioners assert that many of the cited violations of (h)(1) related to saws engaged in sawmill operations or in the manufacture of structural plywood. As to such saws so engaged, it is contended, the substance of (h)(1) cannot be said to constitute a national consensus standard and, without compliance with the provisions of the APA, (h)(1) is invalid. We agree.
 
 
 31
 OSHA asserts in its brief and asserted at oral argument that no cited saw was engaged in sawmill operations or the manufacture of structural plywood; that if a cited saw was operated in connection with a sawmill or a plywood operation it was not in a milling area but in a woodworking area. This would appear to dispose of petitioners' contentions. However, upon the record it is not clear whether any of the saws in question were or were not actually being used in sawmill or plywood operations.
 
 
 32
 We hold that (h)(1) serves as a national consensus standard as to radial saws engaged in woodworking operations, including those carried on in a woodworking area of a sawmill or plywood factory, but cannot serve as a national consensus standard as to saws engaged in sawmilling operations or the manufacture of structural plywood. A remand is necessary in order that the Review Commission may determine whether the citations here involved were for violations of (h)(1) so limited. If they were not, then all citations charging a violation beyond the limited scope of (h)(1) must be dismissed.
 
 
 33
 Petitioners contend that (h)(1) is invalid because compliance with the regulation actually creates a greater hazard to safety than noncompliance. At the hearing before the administrative law judge they presented testimony of a saw expert and of a saw user-employee to the effect that compliance would increase rather than reduce hazard. The administrative law judge ruled in their favor on this issue and was reversed by OSHRC.
 
 
 34
 OSHRC has placed a three-fold burden on employers seeking to assert the greater hazard defense. The employer must demonstrate (1) that the hazards of compliance are greater than the hazards of noncompliance, (2) that alternative means of protecting employees are unavailable, and (3) the unavailability or inappropriateness of obtaining a variance. Petitioners have failed to make any showing as to the availability and appropriateness of obtaining a variance and protest OSHRC's reliance on that failure.
 
 
 35
 In General Electric Co. v. Secretary of Labor, 576 F.2d 558, 561 (3d Cir. 1978), the court dealt with this question. It concluded that if the greater hazard defense could be raised in an enforcement proceeding without first exhausting the variance procedure, employers would tend to bypass that procedure. The court stated:
 
 
 36
 "The flaw in this argument is that some employers will believe Incorrectly that their working conditions are safer than those prescribed in the standards. By removing the incentive to seek variances, the Commission would be allowing an employer to take chances not only with his money, but with the lives and limbs of his employees. This we cannot do."
 
 
 37
 We agree with that holding. As was stated in Diebold, Inc. v. Marshall, 585 F.2d 1327 (6th Cir. 1978):
 
 
 38
 "Both the Commission and the courts have habitually looked on such claims with a jaundiced eye when they have been raised for the first time in enforcement proceedings by employers who have made no prior attempt to seek either a variance * * * or a modification * * *."
 
 Sound Level Violations
 
 39
 Petitioner Weyerhaeuser was charged with violating OSHA Regulation 1910.95, dealing with occupational noise exposure.[5] Petitioner contends that there was no proof of excess duration of employee exposure since the compliance officer's noise level readings lasted only for a few seconds each and the sound level fluctuated in each case throughout the entire work shift.
 
 
 40
 It appears that although the compliance officer took noise readings both during operation of the work area machines and when they were merely idling, OSHRC relied only on the idling level to determine exposure. It was that level, together with testimony that employees worked in these areas at least seven-and-a-half hours daily that formed the basis for the Commission's conclusion that employees were exposed at the least to the idling levels for impermissible time periods.
 
 
 41
 Weyerhaeuser points out that this did not take into consideration the fact that on occasion some machines shut down entirely. With a noise level fluctuating far above the idling level, acceptance of the idling level as a minimum, even when some machines were occasionally shut down, does not appear unreasonable to us. We conclude that the citation was supported by substantial evidence.
 
 
 42
 Weyerhaeuser contends further that the formula for defining a violation was impermissibly vague. That formula provided a means for ascertaining the sound level when based on various fluctuating readings. As we have noted, however, the Commission did not base its conclusion upon the formula but on the idling noise level.
 
 Other Contentions
 
 43
 1. Petitioners contend that some citations were improperly amended to increase the charges from nonserious to serious and to increase the penalty attaching to them. They contend that any effort to change the issued citation which is the subject of dispute amounts to a withdrawal of the citation. We have held to the contrary in California Stevedore & Ballast Co. v. OSHRC, 517 F.2d 986, 988 (9th Cir. 1975). There we stated:
 
 
 44
 "The Secretary's proposed penalty is effective only if not contested; once contested, the OSHRC can affirm the proposed penalty, modify it, vacate it, or direct other appropriate relief. The OSHRC thus determines the penalty de novo, considering the proposed penalty as, in fact, only a proposal."
 
 
 45
 In Long Manufacturing Co. v. OSHRC, 554 F.2d 903, 907 (8th Cir. 1977), the court stated that an employer "does not have any vested right to go to trial on the specific charge mentioned in the citation or to be free from exposure to a penalty in excess of that originally proposed."
 
 
 46
 2. Petitioners contend that all citations must be vacated because they did not issue with reasonable promptness as required by 29 U.S.C. § 658(a). Here, intervals between 15 and 36 days elapsed.
 
 
 47
 In Todd Shipyards Corp. v. Secretary of Labor, 566 F.2d 1327, 1330 (9th Cir. 1977), this court held that a citation will be vacated for delay only if the delay has resulted in demonstrable prejudice to the employer. Petitioners have made no showing of prejudice.
 
 
 48
 3. Petitioners contend that the citations for violations of § 1910.265(c)(22) fail to state the alleged violation with particularity as required by 29 U.S.C. § 658(a). The essential concern of that requirement is that the employer have notice of precisely what he did wrong and what he must do to cure the violation. See Marshall v. Harrison Lumber Co., 569 F.2d 1303, 1308 (5th Cir. 1978); REA Express, Inc. v. Brennan, 495 F.2d 822, 826 (2d Cir. 1974). In our view, petitioners here had ample notice.
 
 
 49
 4. Petitioners contend that the Act violates the Fourth, Fifth, Sixth and Seventh Amendments to the United States Constitution. These claims have all been repeatedly rejected.
 
 
 50
 We find no merit in these contentions.
 
 
 51
 Upon the question whether the citations for violation of § 1910.213(h)(1) charged a violation in excess of the ANSI consensus on which that standard is based, the orders of OSHRC are vacated and the matter remanded to the Commission for further consideration.
 
 
 52
 Upon all other issues, the orders are affirmed.
 
 
 
 *
 Honorable Robert H. Schnacke, United States District Judge of the Northern District of California, sitting by designation
 
 
 [1]
 A few saws of other types were also made the subject of citations, but (h) (1) is the only standard alleged to have been violated
 
 
 [2]
 The same contention is made by petitioners as to citations for violations of mechanical power and sawmill standards, 29 C.F.R. §§ 1910.219 and 1910.265. For the same reason we reject it. We note further that this contention was not made before OSHRC
 
 
 [3]
 Petitioners also raise this issue with regard to the mechanical power and sawmill standards. The answer is the same in that context as in this one. Further, petitioners did not make this argument before OSHRC with regard to the mechanical power and sawmill standards
 
 
 [4]
 The code introduced as the ANSI code is the American Standard Safety Code for Woodworking Machinery, published by the American Standards Association in 1954. That association was the predecessor of ANSI and the code, although later revised, remains the same in all material aspects
 
 
 [5]
 " § 1910.95. Occupational noise exposure
 (b)(1) When employees are subjected to sound exceeding those listed in Table G-16, feasible administrative or engineering controls shall be utilized. If such controls fail to reduce sound levels within the levels of Table G-16, personal protective equipment shall be provided and used to reduce sound levels within the levels of the table."
 This is followed by a table listing hours per day from one quarter to eight, together with permissible sound levels ranging from 90 to 115 decibels for that period of time.