**MODERN DROP FORGE COMPANY, Petitioner,**

v.

**SECRETARY OF LABOR, Respondent.**

No. 81–1579.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1981.

Decided July 26, 1982.

Robert D. Moran, Vorys, Sater, Seymour & Pease, Washington, D. C., for petitioner.

John A. Bryson, U. S. Dept. of Labor, Washington, D. C., for respondent.

Before WOOD, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and ROSZKOWSKI,* District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This is an appeal of a decision and order of the United States Occupational Safety and Health Review Commission (the "Commission"). The Commission found that appellant, Modern Drop Forge Company ("Modern Drop Forge" or the "Company"), committed a "serious" [1] violation of Section 5(a)(2) of the Occupational Safety and Health Act ("OSHA" or the "Act"), 29 U.S.C. § 654(a)(2), since it failed "to comply with occupational safety and health standards promulgated under [the] Act." [2] We affirm.

I.

Modern Drop Forge is a corporation engaged in forging operations. At issue in this appeal are three forging hammers which are activated by foot-operated devices. The hammers are used to shape metal by means of a ram. When an operator presses either a treadle or pedal with his foot, compressed air raises the ram; the ram is then allowed to fall, striking a piece of metal held by an operator using tongs. The ram shapes the metal in a set of dies. With all three hammers, a single depression of the treadle or pedal will cause the ram to rise and then fall.

---

* The Honorable Stanley J. Roszkowski, District Judge of the Northern District of Illinois, is sitting by designation.

1. "Serious" violations are defined in 29 U.S.C. § 666(j):

For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

2. 29 U.S.C. § 654(a)(2) provides that:

Each employer—

\* \* \* \* \* \*

shall comply with occupational safety and health standards promulgated under this Act.

In 1975, Modern Drop Forge wrote to the Commission requesting a clarification of the Company's duty to protect its foot-operated devices. The letter also attempted to request a variance from the requirements of OSHA's standard regulating these devices. In the letter, Modern Drop Forge acknowledged "that many methods for guarding against the [hazard of unintended operation] are feasible" and that the trend is to use "some form of physical guarding on the pedal itself." Nonetheless, the Company sought OSHA approval of a system combining a mechanical treadle with a microswitch. OSHA responded to Modern Drop Forge's letter by suggesting that the Company's proposed system could be improved by use of a circuit interrupter to reduce the possibility of unintended operation. Moreover, OSHA wrote:

It appears from the content of your request that you are seeking approval of a device and not requesting a variance. OSHA does not approve proprietary articles such as your control device. Therefore, no further action will be taken on your application.

Subsequent to its letter to OSHA, Modern Drop Forge installed physical guards over the foot devices of two of the hammers in question.[3] The machine operators objected to the guards since they restricted mobility and, in some cases, hurt the legs of the operators when they moved suddenly. The Company ultimately abandoned all efforts to protect against unintended operation.

In response to an employee complaint to the Occupational Safety and Health Administration, an OSHA compliance officer conducted an inspection of the Company's Blue Island, Illinois plant in September, 1979. Finding that the machines were not protected from unintended operation, the Secretary of Labor (the "Secretary") issued a citation[4] alleging, *inter alia*, that the Company had violated Section 5(a)(2) of the Act, 29 U.S.C. § 654(a)(2), which requires each employer to "comply with occupational safety and health standards."[5] Specifically, the basis for the violation, characterized as "serious," was 29 C.F.R. § 1910.218(b)(2), which provides:

*Forging machines*

\* \* \* \* \* \*

(b) *Hammers, general*

(2) *Foot operated devices*

All foot operated devices (i.e., treadles, pedals, bars, valves, and switches) shall be substantially and effectively protected from unintended operation.

The Secretary ordered abatement of the hazard by December, 1979, and proposed a penalty of $640 for the violation.[6]

Modern Drop Forge contested the citation and proposed penalty. 29 U.S.C. § 659(c). The Secretary filed a formal complaint with the Commission, and the employer filed an answer. An administrative law judge ("ALJ") of the Commission held a hearing. During these proceedings, the Secretary argued that the Company's failure to protect the foot-operated devices from unintended operation was a serious violation of the Act. Unprotected, these hammers could be accidentally activated by

---

**3.** Apparently, no effort was ever made to guard the pedal of the third hammer, which Modern Drop Forge acquired after its correspondence with the Commission.

**4.** The citation in dispute states:

29 C.F.R. § 1910.218(b)(2): The foot operated devices of forging machines were not substantially and effectively protected from unintended operation:

In the new hammershop, the treadles on hammers, 4100, 5000–1 and 5000–2 were not protected against unintended operation subjecting employees to hazards of contact to the movement of the ram and point-of-operation in the dies.

**5.** Modern Drop Forge was cited for noncompliance of several additional OSHA standards which the ALJ vacated following trial. This appeal is limited to the Commission's decision relating to the § 1910.218(b)(2) charge.

**6.** 29 U.S.C. § 666(b) provides that:

Any employer who has received a citation for a serious violation of the requirements of section 5 of this Act, of any standard, rule, or order promulgated pursuant to section 6 of this Act, or of any regulations prescribed pursuant to this Act, shall be assessed a civil penalty of up to $1,000 for each violation.

an employee who stumbled or otherwise inadvertently stepped or fell onto a treadle or pedal, or by a heavy object that was dropped or knocked onto the device. Such unintended operation would subject hammer operators, maintenance personnel, and employees changing dies on the hammers to a serious hazard of amputation of arms, or even death, if part of an employee's body was in the path of the hammer's ram. The Secretary also contended that there were various feasible measures the Company could have taken to provide the protection required by the standard. Modern Drop Forge responded that the cited standard was invalidly promulgated, and thus unenforceable, and that the Secretary had failed to prove a feasible means of protecting the forging hammers.

The ALJ affirmed the Secretary's citation as a serious violation of 29 C.F.R. § 1910.218(b)(2) and assessed a penalty of $640. The ALJ found that the Secretary "established with clarity that each of the three hammers failed to comply with the requirements of the standard." Moreover, he recognized that despite prior employee disapproval of physical guards covering the device, the Secretary had established the feasibility of installing some form of protection. Finally, the ALJ found that the Company was fully aware of the requirements of the standard and had knowledge of the violative conditions.

Modern Drop Forge petitioned for review by the full Commission. 29 U.S.C. § 661(i). Since no Commission member directed review, the ALJ's report became the final order of the Commission. 29 U.S.C. § 661(i); *Secretary of Labor v. Modern Drop Forge Company*, OSHRC Docket No. 79–6331 (April 9, 1981). The Company appealed to this court for review.

## II.

The Act's remedial purpose, broad scope, and expedited operation in enforcement

contexts has been examined elsewhere and need not be repeated here. *See, e.g., Whirlpool Corp. v. Marshall*, 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980); *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Allis-Chalmers Corp. v. OSHRC*, 542 F.2d 27 (7th Cir. 1976); *Brennan v. Butler Lime and Cement Co.*, 520 F.2d 1011 (7th Cir. 1975). On appeal, the Company argues five major points: (1) that the cited regulation is unenforceable under the Act; (2) that the evidence does not support the Commission's finding that the Company violated the regulations; (3) that the Secretary failed to prove the feasibility of his suggested methods of protection; (4) that the evidence fails to establish a significant risk to employees; and (5) that compliance would be more hazardous than noncompliance.[7]

The Commission's determination that Modern Drop Forge committed a serious violation of 29 C.F.R. § 1910.218(b)(2) is conclusive if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 660(a); *International Harvester Co. v. OSHRC*, 628 F.2d 982, 986 (7th Cir. 1980); *Marshall v. L. E. Myers Co.*, 589 F.2d 270, 273 (7th Cir. 1978). The substantial evidence test protects both the factual findings and the inferences derived from them, and if the findings and inferences are reasonable on the record, they must be affirmed even if this court could justifiably reach a different result *de novo*. *NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *H. B. Zachry Co. v. OSHRC*, 638 F.2d 812, 815 (5th Cir. 1981); *A. Schonbek & Co. v. Donovan*, 646 F.2d 799, 800 (2d Cir. 1981).

## III.

In general, the Secretary's standard-setting authority is exercised after substantial prior research, advisory committee review, and notice-and-comment rule-making. 29 U.S.C. § 655(b); *Diebold, Inc. v. Marshall*,

7. The Company also argues that the Commission's decision does not include findings upon all material issues presented on the record, nor were the reasons for its findings clearly enunci-

ated. While we agree with appellant that the Commission's opinion is sparse, the decision comports with the minimal standards required under the Act.

585 F.2d 1327, 1330 (6th Cir. 1978). When enacting OSHA, however, Congress recognized that such rule-making procedures would be time-consuming and would run counter to its goal of "immediately providing a nationwide minimum level of health and safety." S.Rep.No.1282, 91st Cong., 2d Sess. 6, *reprinted in* 1970 U.S.Code Cong. & Ad.News 5177, 5182. Thus, section 6(a) of the Act, 29 U.S.C. § 655(a), provides that "as soon as practicable" during the first two years following enactment, the Secretary "shall" adopt as standards under OSHA "any" safety and health requirement which had been previously set as a standard under another federal statute, as well as "any" requirement consensually set by a nationally recognized standards-producing organization "unless [the Secretary] determines that the promulgation of such a standard would not result in improved safety or health for . . . employees."[8] In authorizing the promulgation of standards without a public hearing or other formal proceedings, Congress reasoned that the standards had been adopted under procedures which had already given diverse views an opportunity to be considered and which indicate that interested and affected persons had reached substantial agreement on their adoption. *See generally,* Bureau of National Affairs, The Job Safety and Health Act of 1970, pp. 23–31 (1971). Moreover, the Secretary's authority under section 6(a) is not an unconstitutional delegation. *Plum Creek Lumber*

*Co. v. Hutton,* 608 F.2d 1283, 1288 (9th Cir. 1979); *Blocksom & Co. v. Marshall,* 582 F.2d 1122, 1125–26 (7th Cir. 1978).

 Section 1910.218 was adopted in 1971 pursuant to 29 U.S.C. § 655(a) as a national consensus standard. Its source standard was the American National Standards Institute ("ANSI") B24.1–1971, Safety Requirements for Forging. *See* 29 C.F.R. § 1910.-221. It provides:

7.8 Foot-Operated Devices[9]

All foot-operated devices (that is, treadles, pedals, bars, valves, and switches) shall be substantially and effectively protected from unintended operation.

Unintended operation includes actuation from falling or moving objects or accidental foot contact. Protection can be provided to prevent unintended operation by the location, design, physical covering of the device, or by a feature at the device which can make the device inoperable.

The note accompanying the standard was excluded; otherwise, the standard was adopted verbatim.

Appellant first notes that in adopting Section 1910.218, OSHA excluded a number of other provisions from the source standard. It then argues that "[s]imple logic dictates that since the source standard is one single document upon which a single consensus was reached, that consensus can no longer exist once some of the document's provisions are withdrawn." Moreover, ap-

---

**8.** The Act separately defines the "national consensus" and "established Federal" standards that the Secretary was directed to issue under section 6(a), and the "occupational safety and health standards" the Secretary is authorized to issue under section 6(b).

Section 3(9) of the Act, 29 U.S.C. § 652(9), defines a "national consensus standard" as: any occupational safety and health standard or modification thereof which (1) has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has been designated as such a standard by the

Secretary, after consultation with other appropriate Federal agencies.

Section 3(10) of the Act, 29 U.S.C. § 652(10), defines an "established Federal standard" as: any operative occupational safety and health standard established by any agency of the United States and presently in effect, or contained in any Act of Congress in force on [the date of enactment of this Act].

Thus, "national consensus" standards are rules set by organizations meeting defined criteria; "established Federal" standards are rules set by Congress or other federal agencies. 29 U.S.C. § 652(9), (10).

**9.** The second paragraph contains information to clarify or explain the standard, safe practices, and recommendations. It should be considered as a guide or suggestion to assist in compliance with the standards.

pellant contends that in excluding more than half of the source standard's provisions, the Secretary failed to observe the specific statutory requirement that

> [w]henever a rule promulgated by the Secretary *differs substantially from an existing national consensus standard*, the Secretary shall, at the same time, publish in the Federal Register a statement of the reasons why the rule as adopted will better effectuate the purposes of this chapter than the national consensus standard.

29 U.S.C. § 655(b)(8) (emphasis added).

The Secretary was granted broad powers to adopt necessary standards during the first two years that the Act was in force. There was no requirement, however, that the Secretary adopt all standards. Section 6(a) provides that the Secretary shall promulgate any standard "*unless* he determines that [it] would not result in improved safety or health . . . ."

Appellant's reliance on *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113 (10th Cir. 1977), is misplaced. In *Kennecott*, the Secretary changed the language of the standard so that it assumed a mandatory, rather than an advisory, character before promulgating it. The court found that the change made a substantive difference in the meaning of the standard and could no longer be considered a national consensus standard. Therefore, the Secretary was required to follow the rule-making procedures set out by the Act. 29 U.S.C. § 655(b). In *Kennecott*, since the Secretary did not comply with the statute nor adopt the ANSI standard verbatim, the standard was unenforceable. In this case, however, the standard was adopted verbatim.[10]

Additionally, appellant's reliance on Section 655(b)(8) of the Act is inapposite. That

provision applies when the Secretary adopts a *permanent* standard that *differs* substantially from an existing national consensus standard.[11] In this case, however, the standard adopted does not differ from the national consensus standard.

■ Appellant also contends that all interim standards promulgated under section 6(a) of the Act, 29 U.S.C. § 655(a), are unenforceable unless they were re-promulgated under the section 655(b) notice-and-comment rule-making procedures. While there was a two-year limit of time for the Secretary to *adopt* national consensus standards as OSHA standards, these standards remain in effect until they are modified or revoked pursuant to section 6(b), 29 U.S.C. § 655(b). Although the "interim" period expired more than eight years ago, section 655(a) standards remain enforceable regulations.

## IV.

■ Since the regulation in question is enforceable under the Act, the next issue is whether there is substantial evidence to support the Commission's finding that the Company's action or nonaction was within the conduct proscribed by 29 C.F.R. § 1910.-218(b)(2). Modern Drop Forge contends that it had, in fact, complied with the cited standard. First, the Company argues that the ALJ improperly interpreted the regulation to require physical guards over the foot-operated devices as the only means of compliance. Second, it alleges that the OSHA inspector was not sufficiently familiar with the forging machines and did not adequately examine the machines to determine whether they had a feature which complied with the standard.

---

**10.** The Secretary has indicated that only mandatory standards should be treated as national consensus standards. Fed.Register 36, No. 1675, p. 10466. Therefore, it was proper for the Secretary to not adopt the commentary as part of the standard.

**11.** There were three reasons for this subsection: to allow the public an explanation of why the Secretary was departing from an existing

consensus standard; to assure that the Act was not intended to preempt or limit the activity or importance of consensus organizations; and to assure that OSHA "take full advantage of the extensive expertise represented by members of technical societies and private standards-development organizations . . . ." 116 Cong.Rec.S. 18356 (Nov. 17, 1970).

The standard does not specify any particular method of achieving its requirement of preventing "unintended operation." The explanatory note which accompanied its source standard, however, mentions four alternative methods of preventing unintended operation. *See Noblecraft Industries, Inc. v. Secretary of Labor*, 614 F.2d 199, 204 (9th Cir. 1980) (comments cannot be ignored in applying national consensus standards because they bear on the scope of the consensus). The comment specifies that protection can be provided "by a feature at the device which can make the device inoperable."

The Company alleges that a butterfly valve which turns off the machine is a "feature at the device which can make the device inoperable." We disagree. The butterfly valve [12] is not a feature *at* the treadle or pedal which *protects against* unintended operation. Rather, it is a device wholly separate from the foot controls and is used to shut down the hammer for maintenance work or the changing of dies.[13] If we accepted appellant's interpretation of the standard, there would be no need for the current OSHA regulation since presumably all machines have at least an on/off switch which could render the machine inoperable.

■ Appellant also notes the testimony of the OSHA inspector to the effect that he did not know whether the cited forge hammers contained "a feature at the device which can make the device inoperable." Since there was no feature, it is irrelevant that he did not know whether the machine contained one. The fact that the officer examined only one of the machines from 3–5 minutes or that he did not know the difference between a pedal and a treadle relates to the weight of his testimony and his credibility as an OSHA witness. This court will not overturn credibility resolutions of the Commission unless they are contradicted by uncontrovertible documentary evidence or physical facts. *Super Excavators, Inc. v. OSHRC*, 674 F.2d 592, 594 (7th Cir. 1981). No such evidence or facts exist here.

■ Finally, appellant contends that the ALJ affirmed the citation as "serious", but made no finding that the cited condition produced a "substantial probability [of] death or serious physical harm" and ignored testimony that evidence of employee endangerment was based upon pure speculation. 29 U.S.C. § 666(j). The first part of the test to uphold a "serious" violation is a calculation of the probable extent of physical injury should the accident occur. Thus, substantial probability that death or physical harm could result refers "not to the probability that an accident will occur, but to the probability that, an accident having occurred, death or serious injury could result." *Illinois Power Co. v. OSHRC*, 632 F.2d 25, 28 (7th Cir. 1980); *Bunge Corp. v. Secretary of Labor*, 638 F.2d 831, 834 (5th Cir. 1981). The second part of the test requires actual or constructive knowledge on the part of the employer. *Bunge*, 638 F.2d at 834.

■ There was sufficient evidence to support the finding of a "serious" violation since there was uncontroverted testimony that in the event of unintended operation, the Company's employees could be exposed to amputation of arms or death. Moreover, the Commission expressly found "employer knowledge," the other element of a "serious" violation. Thus, there was substantial evidence to justify the ALJ's conclusion.

### V.

Appellant argues that the Commission wrongfully placed the burden of establishing a feasible means of compliance upon the employer.[14] In all proceedings commenced

---

**12.** The butterfly valve is a part of the hammer's system for locking out the cycling controls and is regulated separately by 29 C.F.R. § 1910.-218(a)(3)(iii).

**13.** The fact that the hammers are designed so that they are automatically deactivated when the hammer operator takes his foot off the treadle or pedal is also insufficient to meet the regulation's requirement.

**14.** To find that a method of compliance is feasible, it is not necessary to "find general usage in [the] industry .... The question is whether a

by the filing of a notice of contest, the burden of proof rests with the Secretary. 29 C.F.R. § 2200.73(a); *cf. Bunge Corp.*, 638 F.2d at 838 (absent a different allocation of the burden by the substantive statute, burden remains with Secretary). The Company relies on language in the Commission's decision which, it alleges, cast the burden on appellant to prove this essential element of the violation.

■ When the regulation or statute specifies the means for compliance, the burden rests on the employer to show the technological impossibility of the specified means. *See, e.g., Diebold, Inc.*, 585 F.2d at 1333; *A. E. Burgess Leather Co. v. OSHRC*, 576 F.2d 948 (1st Cir. 1978). Where a standard imposes a duty without specifying the means of compliance, however, the Secretary has the burden of establishing the existence of a specific and technologically feasible means of compliance as an element of his showing that a violation has occurred. *Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 733 (6th Cir. 1980); *Diebold, Inc.*, 585 F.2d at 1333; *Schriber Sheet Metal & Roofers,*

*Inc. v. OSHRC*, 597 F.2d 78, 79 (6th Cir. 1979); *see also, Bristol Steel & Iron Works v. OSHRC*, 601 F.2d 717, 723–24 (4th Cir. 1979); *National Realty & Const. v. OSHRC*, 489 F.2d 1257, 1268 (D.C.Cir.1973). This case falls into the latter category since the regulation itself required no specific means of compliance.

■ We believe that the Commission properly allocated the burdens. Modern Drop Forge acknowledges that the Secretary offered various alternative suggestions. Moreover, the Secretary established the feasibility of at least two ways to protect the device.[15] Finally, the Company's contention is untenable in light of its 1975 letter to OSHA which acknowledges the feasibility of protecting the pedals and treadles from unintended operation.[16] The Commission's language on this subject can be interpreted as rejecting the Company's "greater hazard defense" to the Secretary's showing of a feasible means of abating the hazard.

precaution is recognized by safety experts as feasible, not whether the precaution's use has become customary." *National Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1266 n.37 (D.C.Cir.1973); *Voegele Co. v. OSHRC*, 625 F.2d 1075, 1080 (3rd Cir. 1980).

15. The first of these, a physical guard over the mechanical treadle, was also suggested by the manufacturer of Modern Drop Forge's hammers. There was evidence that the Company had a copy of the manufacturer's bulletin. The second method, an electronic treadle, was a treadle manufactured with a guard over it and is activated by the operator inserting his toe into it. The compliance officer testified that the device was being used in another plant with hammers similar to those used by Modern Drop Forge.

16. Modern Drop Forge argues that the use of a letter from a company representative, written in an effort to find a way to comply with an OSHA regulation, as evidence in support of a violation is impermissible unless there is evidence that the letter-writer understood the subtle legal distinctions involved. *Penn-Dixie Steel Corp. v. OSHRC*, 553 F.2d 1078, 1081 (7th Cir. 1977). While this may be true under some circumstances, it is not the case here. *Penn-Dixie* is clearly distinguishable. In *Penn-Dixie*, the Secretary cited the Company with failure to comply with the standards relating to employee

protection against noise levels and failure to ventilate properly. The Secretary advised Penn-Dixie that it had the right to contest the citations, proposed penalties, or both in writing. 29 U.S.C. § 659(a). Under 29 C.F.R. § 1903.17, the cited employer was informed that "[e]very notice of intention to contest shall specify whether it is directed to the citation or to the proposed penalty or both." The company wrote a letter which the Secretary interpreted as a contest only of the proposed penalties, and not of the underlying citations. The court found that no showing was made that the author understood the distinction between a notice of contest of proposed penalty and a notice of contest of citation.

Appellant also relies on *Diebold, Inc.*, 585 F.2d at 1338, to support its argument. In that case, the Sixth Circuit noted that

[i]f employers are not to be dissuaded from taking precautions *beyond the minimum* regulatory requirements, they must be able to do so without concern that their efforts will later provide the *sole* evidentiary basis for an adverse finding of the sort urged here.

(Emphasis added). In this case, however, the Commission is only requesting that Modern Drop Forge comply *with* the minimum regulatory requirements. Moreover, the letter to the Commission is not the sole evidentiary basis for our finding.

Appellant also contends that the burden of proving feasibility encompasses economic, as well as technological feasibility. *Texas Independent Ginners Assoc. v. Marshall*, 630 F.2d 398 (5th Cir. 1980); *RMI Co. v. Secretary of Labor*, 594 F.2d 566, 571–72 (6th Cir. 1979); *Turner Co. v. Secretary of Labor*, 561 F.2d 82, 83 (7th Cir. 1977). In response to a question asking which method Modern Drop Forge should be required to use, the OSHA inspector testified:

> Well, I don't know enough about their business to really say—you are talking about money problems, this sort of thing.

Therefore, the Company argues that there was no showing that any of the possible methods of preventing unintended operation were economically feasible.

First, the cases appellant relies on to support its argument that the Secretary must prove economic feasibility are distinguishable. In *RMI Co.*, the regulation in question specifically required "feasibility" in the language of the regulation. 29 U.S.C. § 655(b)(5); 29 C.F.R. § 1910.95(b). The same may be said for both *Texas Independent Ginners* and *Turner Co.* Secondly, the Company's previous use or contemplated use of a protective mechanism indicates a sufficient level of economic feasibility. Moreover, the fact that other companies having similar hammers comply with the regulation indicates that it is feasible.

Finally, the Company's claim that the Secretary was required to prove industry custom and practice regarding the protection of foot controls is misplaced. The cases cited involve the use of personal protective equipment when employees are exposed to hazardous conditions. In such cases, the Secretary is required to prove hazard recognition to establish a violation, and proof of industry custom or practice is relevant to establish that element of a violation. *See Greyhound Lines-West v. Marshall*, 575 F.2d 759, 762 (9th Cir. 1978). With the standard cited in this case, however, the existence of a hazard is presumed, and industry practice is not an element of the Secretary's *prima facie* case.

## VI.

The Company claims that the Secretary must prove the existence of a hazard and "significant risk" of harm to employees when enforcing a safety standard. A standard which proscribes certain conditions, however, presumes the existence of a safety hazard and the Secretary need not prove that the violative conditions are actually hazardous in an enforcement proceeding.[17] *Bunge Corp.*, 638 F.2d at 834; *Greyhound Lines-West*, 575 F.2d at 762; *Lee Way Motor Freight, Inc. v. Secretary of Labor*, 511 F.2d 864, 869 (10th Cir. 1975). In this case, the cited standard specifies "unintended operation" of the foot devices on the forging hammers as the hazard requiring protection. By establishing the violative condition, *i.e.*, that the Company failed to protect the devices from unintended operation and that employees were exposed to the cited hazard since they work with and around the unprotected machines, the Secretary has met his burden of proof with regard to the existence of a hazard.[18]

17. For example, in *Lee Way Motor Freight, Inc. v. Sec. of Labor*, 511 F.2d 864, 869 (10th Cir. 1975), the court expressly agreed with the Secretary and the Commission that the standard at issue there "presupposes" the existence of a hazard. *Id.* at 869. The court went on to approve the Commission's finding that employees were exposed to the violative conditions, and thus affirmed the citation. *Id.* at 869–70.

If the Secretary promulgates an open-ended standard, on the other hand, he is required by due process to prove the reasonableness of its application in each case to assure that parties subject to its terms have been fairly warned. *See Cape & Vineyard Division v. OSHRC*, 512 F.2d 1148 (1st Cir. 1975). The existence of a hazard is, moreover, relevant to whether the violation constitutes a "serious" one. *Bunge Corp.*, 638 F.2d at 834. When a violation has "no direct or immediate relationship to safety or health," 29 U.S.C. § 658(a), a violation may be considered *de minimus* and accordingly excuse the employer from its obligation to correct the violation. *Lee Way Motor Freight, Inc.*, 511 F.2d at 869.

18. The Company's reliance on the absence of injuries to excuse its failure to comply with the safety standard is misplaced. One of the premier purposes of the Act is "to prevent the first accident, not to serve as a source of consolation for the first victim or his survivors." *Min-*

*Super Excavators,* 674 F.2d at 595 (to state *prima facie* violation of the Act, Secretary need only prove a regulatory standard and its violation); *Greyhound,* 575 F.2d at 762 (same).

In a related context, Modern Drop Forge notes that the Act is intended to protect employees against significant risks to their safety and health, not mere possibilities of hazards. Therefore, on appeal, it claims that the Secretary failed to show a "significant risk" of harm to employees in the enforcement proceeding.[19] The Company relies primarily on *Industrial Union Department, AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) and *Pratt & Whitney Aircraft v. Secretary of Labor,* 649 F.2d 96 (2nd Cir. 1981).

We recently addressed appellant's reliance on *Industrial Union* for this proposition in *Super Excavators, Inc. v. OSHRC,* 674 F.2d 592, 595 (7th Cir. 1981). This court found that the issue in *Industrial Union* was whether Congress might have unconstitutionally delegated legislative power to the Secretary by granting him sweeping authority to set permanent health standards under section 6(b)(5) of the Act, 29 U.S.C. § 655(b)(5). To limit the Secretary's power, the Supreme Court construed section 6(b)(5) as implicitly requiring the Secretary to make a threshold finding that significant occupational risks are present before promulgating any permanent health standard. 448 U.S. at 642, 100 S.Ct. at 2864. Thus, *Industrial Union* chiefly examined the scope

of the Secretary's rule-making authority under section 6(b)(5). In this case, however, appellant challenges the standard governing the Secretary's enforcement power under section 6(a) of the Act. Therefore, *Industrial Union* is not controlling.

No different result is required by the Company's reliance on *Pratt & Whitney Aircraft v. Secretary of Labor,* 649 F.2d 96 (2d Cir. 1981). While that court did impose a "significant risk" requirement in an OSHA enforcement proceeding for one of the standards at issue there, that standard, unlike the one involved in this case, did not presume the existence of a hazard. The standard involved in *Pratt & Whitney,* 29 C.F.R. § 1910.94(d)(7)(iii), required protective measures for those open-surface tank operations which *"may* constitute a fire, explosion, or chemical reaction hazard." 649 F.2d at 102 (emphasis added). Thus, the Secretary bore the burden of proving such a hazard existed. The Commission had held that the "possibility" of a fire or explosion was sufficient to demonstrate noncompliance with the standard. *Id.* at 103. The Second Circuit, relying on *Industrial Union,* was concerned that the Commission was relying on only an "ephemeral" possibility that a hazard existed, and remanded the case to the Commission for a determination as to whether there was any significant risk of a fire or explosion. *Id.* at 104–05. The court's real concern was the fact that the standard presented employers with inadequate notice of when a hazard existed, and thus when corrective measures were required.

*eral Industries & Heavy Const. Group, Brown v. OSHRC,* 639 F.2d 1289, 1294 (5th Cir. 1981); *Allis-Chalmers Corp. v. OSHRC,* 542 F.2d at 31.

**19.** The Commission argues that Modern Drop Forge waived its right to argue this point by failing to raise it before the ALJ or the full Commission in the Company's petition for discretionary review. Section 11(a) of the Act precludes judicial review of objections not urged before the Commission, absent excuse due to extraordinary circumstances. 29 U.S.C. § 660(a). The Commission urges that there are no such circumstances present in this case. The Company responds that it "has consistently argued the matter of employee risk of harm throughout these proceedings." It certainly requires some careful reading on our

part to find that appellant argued below that the Secretary must prove "significant risk" of harm. Even appellant concedes that its use of language was not precise. Reply Brief at 6, n.4. Moreover, simply citing a case below in one context and then, on appeal, arguing that the same case stands for something else does not preserve an argument. However, because the Company at least arguably raised the issue of proving "significant risk", we consider the issue in a limited context. *Cf. Brennan v. OSHRC,* 511 F.2d 1139 (9th Cir. 1975) (failure of Secretary to raise issue either before ALJ or Commission did not preclude Secretary from raising the question on appeal as issue was legal question fundamental in instant case).

In any event, any duty of the Secretary to establish significant risk was adequately met. There was no extension of the standard's applicability into areas that are beyond the scope of the Act. *See, e.g., Pratt & Whitney Aircraft*, 649 F.2d at 103. Uncontroverted testimony by the Secretary's witness as to the potential harm facing Modern Drop Forge's employees in the event of unintended operation of the hammers and testimony substantiated by the Company's witness met the burden in this case.

### VII.

Appellant contends that the purpose of the cited standard—to protect against unintended operation—would actually be frustrated by compliance with the regulation. "Both the Commission and the courts have habitually looked on such claims with a jaundiced eye ...." *Diebold, Inc.*, 585 F.2d at 1339. Nonetheless, the Company argues that the testimony of its employee-witness and a letter written by the union to OSHA in 1975 prove that compliance would be more hazardous than noncompliance.[20]

There is a three-fold burden on an employer who seeks to assert the greater hazard defense. The employer must demonstrate (1) that the hazards of compliance are greater than the hazards of noncompliance, (2) that alternative means of protecting employees are unavailable, and (3) that a variance is unavailable or inappropriate. *Nobelcraft*, 614 F.2d at 205. In this case, appellant has only argued that physical guarding of the devices would create more of a hazard than no protection. Since there are other methods of compliance which the Company has not tried and since the Company has not shown that such alternative means are unavailable, it has not carried its burden. This is especially true in light of the fact that in response to the Company's letter, OSHA suggested one alternative which the Company might have pursued

and which might have satisfied the standard's requirement.

Finally, a showing that the Company sought and was refused a variance is important. If the greater hazard defense could be raised in an enforcement proceeding without first exhausting the variance procedure, employers would tend to bypass that procedure.

> [S]ome employers [would] believe *incorrectly* that their working conditions are safer than those prescribed in the standards. By removing the incentive to seek variances, the Commission would be allowing an employer to take chances not only with his money, but with the lives and limbs of his employees.

*General Electric Co. v. Secretary of Labor*, 576 F.2d 558, 561 (3d Cir. 1978). Although Modern Drop Forge attempted to request a variance, the Commission found otherwise and clearly communicated its interpretation to the Company.

### VIII.

Based on the foregoing, the Commission's findings are AFFIRMED.

---

**20.** The Company presented evidence that at other forging companies, hammermen refused to operate the machines until the physical guards were removed. It is appropriate for the Commission, however, to require employers to make extensive good-faith efforts to induce

compliance with provisions of the Act, including actions which employees may resist through work stoppages. *I.T.O. Corp. of New England v. OSHRC*, 540 F.2d 543 (1st Cir. 1976).