715 F.2d 57
 11 O.S.H. Cas. (BNA) 1641, 1983 O.S.H.D. (CCH)
P 26,647
 PRATT & WHITNEY AIRCRAFT, DIVISION OF UNITED TECHNOLOGIES
CORPORATION, Petitioner,
v.
Raymond J. DONOVAN, Secretary of Labor and Occupational
Safety and Health Review Commission, Respondents.
 No. 1055, Docket 82-4186.
 United States Court of Appeals,
Second Circuit.
 Argued April 15, 1983.
Decided Aug. 12, 1983.
 
 Edward J. Dempsey, Hartford, Conn. (Joseph C. Wells, Farmer, Wells, McGuinn & Sibal, Hartford, Conn., of counsel), for petitioner.
 Laura V. Fargas, U.S. Dept. of Labor, Washington, D.C. (Albert H. Ross, Regional Sol., Boston, Mass., T. Timothy Ryan, Jr., Sol. of Labor, Frank A. White, Associate Sol., Occupational Safety and Health, Dennis K. Kade, Counsel for Appellate Litigation, U.S. Dept. of Labor, Washington, D.C., of counsel), for respondents.
 Before FEINBERG, Chief Judge, MESKILL, Circuit Judge, and WYATT,* District Judge.
 MESKILL, Circuit Judge:
 
 
 1
 We are asked to review for the second time a final order of the Occupational Safety and Health Review Commission (Commission) holding Pratt & Whitney Aircraft, Division of United Technologies Corporation (Pratt & Whitney), in serious violation of 29 C.F.R. § 1910.94(d)(7)(iii) (1982), a safety and health standard promulgated pursuant to the Occupational Safety and Health Act of 1970 (OSHA).[1] 29 U.S.C. §§ 651-78 (1976 & Supp. II 1978). The standard provides that "[t]wo or more operations shall not be connected to the same exhaust system where either one or the combination of substances removed may constitute a fire, explosion, or chemical reaction hazard in the duct system."
 
 
 2
 In its original order, the Commission held that the Secretary had established a serious violation of section 1910.94(d)(7)(iii) by showing the "realistic possibility" of a fire, explosion, or chemical reaction hazard in the common duct systems servicing plating operations at Pratt & Whitney's manufacturing plant in North Haven, Connecticut. We vacated the Commission's order in Pratt & Whitney Aircraft v. Secretary of Labor, 649 F.2d 96 (2d Cir.1981), because the test employed by the Commission "would permit this safety standard to be applied to conditions posing insignificant risks that are beyond the scope of the [OSHA] Act." Id. at 104. But we remanded the case so that the Commission could determine whether Pratt & Whitney's use of common ducts gave rise to a "significant risk" of a fire, explosion, or chemical reaction hazard. The Commission reaffirmed its prior decision and Pratt & Whitney filed the instant petition for review pursuant to 29 U.S.C. § 660(a) (1976). Pratt & Whitney complains that the Commission improperly applied the significant risk test formulated by this Court and, alternatively, argues that there is insufficient evidence to sustain the Commission's decision.
 
 
 3
 The petition for review is granted and the Commission's order, to the extent that it affirmed the citation for violation of 29 C.F.R. § 1910.94(d)(7)(iii), is set aside.
 
 BACKGROUND
 
 4
 Part of Pratt & Whitney's manufacturing plant in North Haven, Connecticut is reserved for electroplating jet engine parts with various substances, including cadmium, chrome, silver, copper and nickel. There are seven separate plating lines, each line comprised of open tanks of solutions into which jet engine parts are dipped for cleaning, rinsing, plating and slushing. All seven lines contain open tanks of cyanides and acids. In addition, one plating line contains open tanks of hydrogen peroxide, concentrated acetic acid and heated slushing oil. Each plating line is serviced by an exhaust system comprised of individual exhaust ducts suspended over the open tanks which are connected by a chimney-like "plenum" to a common duct that feeds the exhaust through a stack in the roof.
 
 
 5
 After an inspection of the North Haven plant in the spring of 1975, the Secretary issued a citation to Pratt & Whitney alleging, in part, that the manufacturer's use of common exhaust ducts to service its plating lines constituted a serious violation of 29 C.F.R. § 1910.94(d)(7)(iii) (1982) in that the substances removed from the open tanks could combine in the common ducts to pose a fire, explosion, or chemical reaction hazard.[2] At a full hearing before an Administrative Law Judge (ALJ) in 1975, the Secretary contended that acid mists and cyanide mists could rise from the open tanks and combine in the common duct of each plating line to form hydrogen cyanide gas. This deadly gas could conceivably asphyxiate employees who were near the stacks on the roof or, if a downdraft swept the gas back into the plating department, employees who were in the plant. Hydrogen cyanide gas also poses a serious fire or explosion hazard because of its low flash point.
 
 
 6
 In addition, the Secretary maintained that at one plating line mists rising from a tank containing hydrogen peroxide could mix in the common duct with mists rising from a tank containing heated slushing oil to create a high hazard of explosion. Moreover, hydrogen peroxide mists could combine with acetic acid mists to form peracetic acid which also poses fire and explosion hazards.
 
 
 7
 The ALJ vacated the citation because the Secretary had failed to prove that the alleged hazards were likely to materialize.
 
 
 8
 Complainant's evidence does not demonstrate the existence of hydrogen cyanide gas or peracetic acid in the common duct system. It does not establish that the hydrogen peroxide and slushing oil combine in the common duct. The Secretary has presented textbook theory, without obtaining readily available information which would show whether there existed at Respondent's facility those specific conditions required for the creation of a fire, explosion, or chemical reaction hazard. He has offered nothing more than conjecture. In addition, he suggests that a hazard might arise ... by virtue of a ventilation breakdown, malfunction of the heating systems for the various solutions, spontaneous combustion caused by an employee's smoking, heat caused by mechanical failure, a down-draft of effluent or "by some yet unimagined happening." We have no showing of any reasonable likelihood of such mishaps; the Secretary might just as well have suggested the possibilities of arson or insurrection.
 
 
 9
 J.App. at 11. The Commission, however, reinstated the citation on this score.
 
 
 10
 Section 1910.94(d)(7)(iii) is violated whenever the same exhaust system is used to remove two or more substances, when either one or a combination of the substances may constitute a fire, explosion or chemical reaction hazard in the duct system. The use of the word "may" makes it clear that a violation is established whenever a hazardous combination of the substances is possible. It is not necessary to prove that the chemical reaction is reasonably likely or that the prohibited hazards actually threaten employees at the time of the inspection. The standard is directed toward the control of possible or potential hazards. Cf. Brennan v. OSHRC and Underhill Constr. Corp., 513 F.2d 1032, 1039 (2d Cir.1975).
 
 
 11
 J.App. at 18. Despite "the relatively low likelihood of an incident," the Commission concluded that the Secretary had demonstrated a serious violation of OSHA because "in the event of an incident, there is a substantial probability that death or serious physical injury would result." Id. at 20.
 
 
 12
 We vacated the Commission's order. While section 1910.94(d)(7)(iii) speaks in terms of possibilities, we held, in light of the Supreme Court's decision in Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality opinion), that the regulation "can properly be interpreted as proscribing an employer's use of a common exhaust system only where there exists a 'significant risk' that a combination of the substances removed will cause a fire, explosion, or chemical reaction hazard." 649 F.2d at 104; see Industrial Union Department, 448 U.S. at 641, 100 S.Ct. at 2863 ("both the language and structure of the [OSHA] Act, as well as its legislative history, indicate that it was intended to require the elimination, as far as possible, of significant risks of harm"). Because the Commission's "possibility" standard embraced conditions beyond the scope of OSHA, we set aside its order and remanded the case.
 
 
 13
 The Commission did not receive further evidence on remand. After reviewing the record in light of briefs submitted by the parties, a divided Commission reaffirmed its earlier decision on the Secretary's section 1910.94(d)(7)(iii) claim. The two Commissioners who made up the majority had participated in the earlier decision. The Chairman of the Commission, appointed after the first decision, dissented from the second decision. In reaffirming the first decision, the majority rejected the ALJ's conclusion that the likelihood of any hazard was too minimal to support a violation of the standard. Instead, it credited the testimony of the Secretary's expert witness that the industry practice is to vent separately the types of chemicals involved and the testimony of Pratt & Whitney's industrial hygienist that using exhaust ducts under the circumstances existing at the North Haven plant was not a good practice. Recognizing that the purpose of OSHA is to prevent accidents, Brennan v. OSHRC, 491 F.2d 1340, 1343 (2d Cir.1974), the Commission concluded:
 
 
 14
 The hazardous substances involved here could combine to quickly, perhaps with virtually no warning, bring death or serious physical harm to [Pratt & Whitney's] employees. It is our conclusion that the cited standard was drafted to prevent such eventualities; interpreting it to require proof of the actual existence of hazardous chemical combinations in the duct system undermines the standard's preventative purpose and essentially means that a showing of noncompliance with the standard's terms would have to await employee injuries from hazardous chemical combinations.
 
 
 15
 J.App. at 200-01. In dissent, Chairman Rowland chastised the majority for applying the same test that this Court had earlier rejected--only couched in different terms. He accepted the ALJ's conclusion that the Secretary had at best established "only a remote possibility of a fire, explosion, or chemical reaction hazard," and concluded that the record could not support the majority's finding of a "significant risk." Id. at 207.
 
 DISCUSSION
 
 16
 Because the Commission did not receive additional evidence on remand, its task was limited to evaluating the Secretary's evidence under the "significant risk" standard to determine whether the Secretary had demonstrated a serious violation by a preponderance of the evidence. Olin Construction Co. v. OSHRC, 525 F.2d 464, 466 (2d Cir.1975) (per curiam). Pratt & Whitney accuses the Commission of improperly applying the significant risk test by considering only the seriousness of the alleged hazard while ignoring the likelihood of the hazard being realized and contends that under the proper standard the Secretary has failed to sustain his burden of proof.
 
 
 17
 Our standard of review is whether the Commission's interpretation and application of 29 C.F.R. § 1910.94(d)(7)(iii) (1982) is reasonable and consistent with OSHA. General Electric Co. v. OSHRC, 583 F.2d 61, 64 (2d Cir.1978); Brennan v. OSHRC, 491 F.2d 1340, 1344 (2d Cir.1974); cf. Donovan v. Castle & Cooke Foods, 692 F.2d 641, 645 (9th Cir.1982) ("We must uphold the agency's decision, unless we find it to be arbitrary and capricious, not in accordance with the law, or in excess of the authority granted by the Act."). Although we commonly defer to an agency's interpretation of its own regulations,[3] we will not defer to an interpretation of section 1910.94(d)(7)(iii) that embraces hazards not within the intended scope of the standard, Carlyle Compressor Co. v. OSHRC, 683 F.2d 673, 675 (2d Cir.1982), or an interpretation that encompasses conditions beyond the scope of OSHA, Pratt & Whitney Aircraft v. Secretary of Labor, 649 F.2d 96, 103 (2d Cir.1981). However, we will not substitute our judgment for the Commission's if its interpretation of section 1910.94(d)(7)(iii) is reasonable and consistent with our prior decision in this case. See Donovan v. Castle & Cooke Foods, 692 F.2d at 646; Super Excavators, Inc. v. OSHRC, 674 F.2d 592, 594 (7th Cir.1981), cert. denied, 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1350 (U.S.1982); see also Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 49-50 (2d Cir.1976), aff'd sub nom. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).
 
 I. The Standard As Interpreted
 
 18
 Section 1910.94(d)(7)(iii) provides that "[t]wo or more operations shall not be connected to the same exhaust system where either one or the combination of the substances removed may constitute a fire, explosion, or chemical reaction hazard in the duct system." In our prior opinion we rejected the Commission's position that section 1910.94(d)(7)(iii) is violated whenever there exists the mere possibility of a fire, explosion, or chemical reaction hazard. We relied on the legislative history of OSHA as interpreted by the Supreme Court in Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality opinion), which indicates that OSHA was "intended only to guard against significant risks, not ephemeral possibilities." Pratt & Whitney Aircraft v. Secretary of Labor, 649 F.2d at 104. Neither the Secretary by regulation nor the Commission by decision can extend the scope of OSHA beyond the boundaries defined by Congress. See Insurance Company of North America v. Gee, 702 F.2d 411, 414 (2d Cir.1983) ("this Court will not interpret an agency regulation to thwart a statutory mandate"); Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d at 50 (" '[A]n agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate.' " (quoting FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620 (1973))). We left to the Commission on remand the task of applying the "significant risk" test to the facts of this case.[4]
 
 
 19
 On remand, the Commission interpreted "the cited standard at section 1910.94(d)(7)(iii), when applied under the 'significant-risk' test[,] to encompass the protection of employees from fire, explosion or chemical reaction hazards that are unusual or infrequent." J.App. at 193. Pratt & Whitney complains that the Commission misinterpreted the significant risk test. We disagree. Unusual or infrequent hazards undoubtedly can in some circumstances pose a meaningful possibility of injury and the Commission's conclusion that section 1910.94(d)(7)(iii) may encompass those types of risks is unassailable. The Supreme Court has instructed that the significance of a potential hazard is not solely a function of mathematical probability. Industrial Union Department, 448 U.S. at 655, 100 S.Ct. at 2870. Likewise, the significance of a potential hazard is not solely a function of the gravity of harm that would result if the hazard were realized.
 
 II. The Standard As Applied
 
 20
 Although the Commission's interpretation of section 1910.94(d)(7)(iii) is reasonable, its application of the standard to the facts of this case cannot withstand scrutiny. In evaluating the Commission's application of section 1910.94(d)(7)(iii), we are constrained by 29 U.S.C. § 660(a) (1976) which makes the Commission's findings of fact conclusive if supported by substantial evidence. CCI, Inc. v. OSHRC, 688 F.2d 88, 89 (10th Cir.1982); Super Excavators, Inc. v. OSHRC, 674 F.2d at 594. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), quoted in American Textile Manufacturers Institute, Inc. v. Donovan, 452 U.S. 490, 522, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1981). While we are not free to pick and choose between the conflicting findings of the ALJ and the Commission, we are entitled to evaluate the Commission's conclusions in light of the contrary findings of the ALJ. Pratt & Whitney Aircraft v. Secretary of Labor, 649 F.2d at 105.
 
 
 21
 Unlike most of the Secretary's safety and health standards, section 1910.94(d)(7)(iii) does not presume the existence of a safety hazard. See Modern Drop Forge Co. v. Secretary of Labor, 683 F.2d 1105, 1114-15 (7th Cir.1982). Instead, the standard proscribes common venting only in circumstances where the substances removed may alone or in combination pose a threat to employee safety. Thus, to establish a prima facie case of a violation of section 1910.94(d)(7)(iii), the Secretary must show more than the mere use by an employer of a common exhaust system; he must show that (1) substances are or are likely to be removed which (2) either alone or in combination (3) pose a fire, explosion, or chemical reaction hazard. Cf. Super Excavators, Inc. v. OSHRC, 674 F.2d at 595 ("To state a prima facie violation of the [OSHA] Act, the Secretary need only prove a regulatory standard and its violation, where the standard is specific."). Moreover, the Secretary must show more than the mere possibility of injury; he must show that the potential hazard presents a significant risk of harm. Pratt & Whitney Aircraft v. Secretary of Labor, 649 F.2d at 104.
 
 
 22
 Whether there exists a significant risk depends on the seriousness of the potential harm and the likelihood of that harm being realized. Cf. W. Prosser, Law of Torts § 31, at 147 (4th ed. 1971) ("As the gravity of the potential harm increases, the apparent likelihood of its occurrence need be correspondingly less." (footnote omitted)). The question is one part empirical and one part policy-based. Industrial Union Department, 448 U.S. at 655 n. 62, 100 S.Ct. at 2871 n. 62. The likelihood of injury and the corresponding measure of harm resulting therefrom are factual determinations which, if supported by substantial evidence, are conclusive. 29 U.S.C. § 660(a) (1976). Whether there exists a significant risk is a determination that is also subject to the substantial evidence rule, provided, of course, that the determination is consistent with OSHA. Texas Independent Ginners Association v. Marshall, 630 F.2d 398, 404 & n. 22 (5th Cir.1980); see K. Davis, Administrative Law Treatise § 29.00-1, at 525-26 (Supp.1982) (as applied to policy decisions, the "substantial evidence" standard must be equated to the test of reasonableness).
 
 
 23
 A. Fire, Explosion and Chemical Reaction Hazard From the Combination of Acid Mists and Cyanide Mists in the Common Ducts
 
 
 24
 Hydrogen cyanide gas (HCN gas) is a very potent poison capable of causing death or serious bodily harm. The gas is also flammable and explosive. It is undisputed that each of the seven plating lines at Pratt & Whitney's North Haven plant contained open tanks of acids and cyanides and that HCN gas can evolve from a combination of acid mists and cyanide mists.
 
 
 25
 The Secretary alleged and the Commission found that acid mists and cyanide mists could rise from the open tanks and combine in the common ducts to create a fire, explosion and chemical reaction hazard. The Commission relied primarily on the testimony of the Secretary's expert witness, David A. Padden. Although Padden had never visited the North Haven plant, he explained that HCN gas would probably form if a common duct were used to vent the acids and cyanides used in plating operations.
 
 
 26
 We hold that on the record as a whole the Commission's finding is not supported by substantial evidence. Donovan v. Daniel Construction Co., 692 F.2d 818 (1st Cir.1982). The Secretary offered no evidence to prove that HCN gas is present in the common ducts, that cyanide mists are present in the common ducts, that cyanide mists rise from the plating lines, or that such mists are likely to rise from the open tanks. Although simple tests are available to detect HCN gas, the Secretary did not use them. The Secretary's expert witness, Padden, acknowledged that he did not know the concentration, if any, of HCN gas in the common duct, the velocities of the exhaust systems, or the temperatures of the solutions in the open tanks--information, he conceded, that would have helped him form an expert opinion. When asked how he was able to conclude without this information that a hazard existed, Padden responded: "The common duct work does make it possible that there may be a reaction between the cyanides and the acids, an intermixing of those." J.App. at 113 (emphasis added).
 
 
 27
 To establish a violation of section 1910.94(d)(7)(iii), the Secretary must show more than the mere possibility of a fire, explosion, or chemical reaction hazard. At a minimum he must show the existence of conditions likely to lead to the formation of HCN gas in the common ducts. In his brief on appeal, the Secretary asserts: "Acid and cyanide mists naturally will rise from the surface of plating line tanks containing these solutions." Br. of Respondent at 3. Yet, there is no evidence in the record to support this assertion.
 
 
 28
 Similarly, there is virtually no evidence to support the Commission's finding that "[s]ince parts were constantly being immersed into the solutions, ... the solutions could become sufficiently agitated that cyanide mists could be drawn into the ductwork, react with the acid mists and vapors that were undisputedly already there, and form HCN." J.App. at 195. While Pratt & Whitney concedes that acid mists and cyanide mists would be likely to rise from the open tanks if the solutions were severely agitated or heated to boiling, the Secretary offered no evidence to establish the likelihood of these circumstances occurring. Chairman Rowland's careful evaluation of the evidence led him to conclude in dissent that:
 
 
 29
 [T]he record does not contain any evidence about the extent to which the surfaces of the acid and cyanide solutions were agitated during actual plant operations, nor does the evidence show any appreciable likelihood of HCN being formed as a result of agitation of the surfaces of the acid or cyanide solutions. Indeed, [Pratt & Whitney's] expert, Doyle, testified from personal experience that the cyanide solutions in the tanks only released water vapor and an ammonium compound into the air to be carried into the ductwork above the cyanide tanks.
 
 
 30
 J.App. at 202-03. On the record before us, it was not reasonable for the Commission to conclude that the testimony of the Secretary's expert, based upon what the ALJ aptly described as "textbook theory," J.App. at 11, carried the Secretary's burden of proof in the face of expert testimony for Pratt & Whitney that was based upon personal observation and testing. See Modern Drop Forge Co. v. Secretary of Labor, 683 F.2d 1105, 1112 (7th Cir.1982); Olin Construction Co. v. OSHRC, 525 F.2d 464, 467 (2d Cir.1975) (per curiam).
 
 
 31
 B. Fire and Explosion Hazard From Combinations of Hydrogen Peroxide, Acetic Acid and Heated Slushing Oil
 
 
 32
 One of the seven plating lines in Pratt & Whitney's North Haven plant contained open tanks of hydrogen peroxide, acetic acid and heated slushing oil. The Secretary alleged that (1) hydrogen peroxide and heated slushing oil could combine in the common duct to create a fire or explosion hazard, and (2) hydrogen peroxide could combine with acetic acid to form peracetic acid, an extreme oxidizing agent which could cause an explosion if combined in the common duct with heated slushing oil.
 
 
 33
 Relying primarily on the testimony of the Secretary's expert witness, Padden, the Commission reinstated the Secretary's citation for this alleged violation of section 1910.94(d)(7)(iii). The Commission reasoned:
 
 
 34
 Padden, testifying for the Secretary, explained that if [Pratt & Whitney's] ventilation system failed, and the production of heated slushing oil and hydrogen peroxide continued, small globules of oil and chemicals would be emitted from the plating line tanks which could be drawn through the exhaust system into the common duct and cause a chemical reaction. When Padden was asked about the effect of a failure of [Pratt & Whitney's] ventilation system on the mixture of peracetic acid and slushing oil mists, he testified that the two substances would meet without diffusion. These reactions could result even if a down-draft did not occur. As noted above, the Secretary's industrial hygienist, Larsen, had testified earlier that exhausting peracetic acid and heated oil through the same duct presented fire and explosion hazards. Mr. Dupre, [Pratt & Whitney's] safety engineer, testified that a fire had previously occurred in [Pratt & Whitney's] ductwork. Consequently, in light of the above testimony and particularly in light of the abundant testimony from both the Secretary's and [Pratt & Whitney's] witnesses about failures in [Pratt & Whitney's] ventilation system, we find that the Secretary has proven there was a significant risk of fire and explosion in [Pratt & Whitney's] common duct system as a result of a combination of the aforementioned substances.
 
 
 35
 J.App. at 197 (footnote omitted).
 
 
 36
 The Commission's findings with respect to the alleged fire and explosion hazards suffer from the same deficiencies as its findings with respect to the alleged HCN hazards. Chairman Rowland's dissenting opinion forcefully attacks the majority's findings and exposes the flimsy evidentiary foundation supplied by the Secretary and relied on by the Commission:
 
 
 37
 Even assuming, as the majority states, that [Pratt & Whitney's] industrial hygienist Dunstan conceded that hydrogen peroxide and oil entered the common duct, Dunstan did not state that the mixing of hydrogen peroxide and heated oil would therefore occur. Rather, his testimony was to the contrary. Dunstan stated that there were two tanks of cyanide solution between the hydrogen peroxide and the oil tanks and that as the hydrogen peroxide moved through the common duct it would be decomposed into water by the cyanides before it could even reach any oil. In fact, Dunstan further stated that he tested for the presence of oil in the ductwork and found only a dry residue, indicating oil was not present in the ductwork. Dunstan also testified that a reaction between hydrogen peroxide and slushing oil would require a temperature of about 390 ? F. The temperature of the oil, however, was no more than about 300 ? F., while the hydrogen peroxide was not heated. According to Dunstan, he measured the temperature of the air entering the duct from the oil tank at about 85 ? F. Based on a measured air flow of about 6000 cubic feet per minute, Dunstan estimated the temperature inside the duct to be only about 90 ? F. He concluded, therefore, that heated oil and hydrogen peroxide did not present a hazard.
 
 
 38
 The Secretary did not rebut Dunstan's testimony. Indeed, the Secretary's own expert witness, Padden, admitted on rebuttal that he did not actually know if hydrogen peroxide or slushing oil entered the common duct. Padden also admitted that a knowledge of the velocities of the exhaust system would have been helpful to him in arriving at his opinion on the likelihood of the occurrence of hazardous chemical reactions. Yet, neither Padden nor the Secretary's industrial hygienist, Larsen, measured the airflow into the duct system.
 
 
 39
 The majority opinion also finds that the Secretary proved his allegation of hazards stemming from the formation of peracetic acid. Dunstan, however, testified that a temperature between 140 ? -180 ? F. is required for the formation of peracetic acid and that it takes some period of time before any appreciable amount of the acid can be developed. Although Larsen claimed that heat was not required to produce peracetic acid, he did concede, as did Padden, that peracetic acid did not present an explosion hazard unless it was heated to 230 ? F.; Padden stated that the flash point of peracetic acid is 105 ? F. Yet, as previously noted, Dunstan estimated the duct temperature to be only at about 90 ? F. Larsen admitted that he had made no determination regarding the temperature in the ducts.
 
 
 40
 J.App. at 204-06 (footnotes omitted).
 
 
 41
 The Commission's decision cannot be sustained on either the facts or the law. The Secretary bore the burden of establishing a violation of section 1910.94(d)(7)(iii), yet he offered no evidence to prove that circumstances existing at the plating lines are likely to lead to the alleged hazards. A risk cannot be deemed significant absent some showing by the Secretary of the circumstances likely to give rise to the alleged hazard. Without such a showing, the Secretary's allegations fail to rise above sheer speculation. The facts of this case cannot support a reasonable inference that the substances removed through the common ducts pose a significant risk of the hazards defined in section 1910.94(d)(7)(iii). Padden's testimony that the industry practice is to vent separately the substances involved is no substitute for evidence tending to show a significant risk of fire, explosion, or chemical reaction hazard in the common ducts servicing plating operations at Pratt & Whitney's North Haven plant.
 
 
 42
 Because the parties chose not to introduce additional evidence on remand, they were apparently satisfied with the present state of this eight year old record. Accordingly, we will not remand again. The petition for review is granted and the Commission's order, to the extent that it affirmed the citation for a violation of 29 C.F.R. § 1910.94(d)(7)(iii), is set aside.
 
 
 
 *
 Honorable Inzer B. Wyatt, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The stated purpose of OSHA is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b) (1976). In furtherance of this lofty goal, Congress authorized "the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce," 29 U.S.C. § 651(b)(3) (1976), and required employers and, in some circumstances, employees to comply with these standards, 29 U.S.C. § 654(a)(2), (b) (1976), or risk a citation, 29 U.S.C. § 658 (1976), and subsequent enforcement proceedings, 29 U.S.C. § 659 (1976)
 To insure swift implementation of OSHA, Congress instructed the Secretary, "as soon as practicable," but in no case more than two years following enactment, to promulgate as an occupational safety and health standard any previously recognized standard under federal law or any "national consensus standard" which the Secretary finds would improve health and safety conditions in the workplace. 29 U.S.C. § 655(a) (1976). In addition, the Secretary was empowered to promulgate occupational safety and health standards designed "to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8) (1976), only after prior research, advisory committee review and a notice and comment period, 29 U.S.C. § 655(b) (1976). See Modern Drop Forge Co. v. Secretary of Labor, 683 F.2d 1105, 1109-10 (7th Cir.1982). The regulation at issue in this case, 29 C.F.R. § 1910.94(d)(7)(iii) (1982), was adopted as a national consensus standard. Its source standard was the American National Standards Institute Z9.1-1969, Safety Code for Ventilation and Operation of Open-Surface Tanks. See 29 C.F.R. § 1910.99 (1982).
 
 
 [2]
 In addition to the citation for a serious violation of 29 C.F.R. § 1910.94(d)(7)(iii), Pratt & Whitney was cited for a serious violation of the general duty clause, 29 U.S.C. § 654(a)(1) (1976), and twenty-four nonserious violations. The Commission affirmed the citation for the serious violation, but set aside several of the citations for nonserious violations. In Pratt & Whitney Aircraft v. Secretary of Labor, 649 F.2d 96, 98 (2d Cir.1981), we upheld the citation for the serious violation of the general duty clause as well as the citations for the nonserious violations except that citation alleging a nonserious violation of 29 C.F.R. § 1910.132(a) (1982). Id. at 106. On remand, the Commission vacated the section 1910.132(a) claim on the Secretary's motion. J.App. at 187. The only citation at issue in this case is that alleging a serious violation of 29 C.F.R. § 1910.94(d)(7)(iii)
 
 
 [3]
 We are mindful that the Commission and the Secretary are united in support of the Commission's interpretation of section 1910.94(d)(7)(iii), but their combined expertise and experience, although formidable, does not warrant a greater degree of judicial deference than we commonly accord an agency's interpretation of its own regulations, General Electric Co. v. OSHRC, 583 F.2d at 64 n. 7, particularly when the Commission is essentially an umpiring agency, its role limited to administrative adjudication, 29 U.S.C. §§ 659(c), 661 (1976); see General Electric Co. v. OSHRC, 583 F.2d at 63 n. 3; Brennan v. OSHRC, 491 F.2d at 1344; see also Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 49 (2d Cir.1976), aff'd sub nom. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977)
 
 
 [4]
 Before considering the merits of Pratt & Whitney's arguments, we pause to consider the Secretary's continued disagreement with out prior holding that 29 C.F.R. § 1910.94(d)(7)(iii) proscribes "an employer's use of a common exhaust system only where there exists a 'significant risk' that a combination of the substances removed will cause a fire, explosion, or chemical reaction hazard." 649 F.2d at 104. The Secretary relies on the Seventh Circuit's recent decision in Modern Drop Forge Co. v. Secretary of Labor, 683 F.2d 1105 (7th Cir.1982), in which the court held that "[a] standard which proscribes certain conditions ... presumes the existence of a safety hazard and the Secretary need not prove that the violative conditions are actually hazardous in an enforcement proceeding." Id. at 1114 (footnote omitted). The Secretary ignores, however, the crucial distinction between the health and safety standard at issue in Modern Drop Forge and the standard at issue in this case. The Seventh Circuit distinguished our prior decision in this case on the ground that section 1910.94(d)(7)(iii), unlike the standard at issue in Modern Drop Forge, "did not presume the existence of a hazard." Id. at 1115
 Section 1910.94(d)(7)(iii) proscribes common exhaust systems where the "substances removed may constitute a fire, explosion, or chemical reaction hazard." While it may have been reasonable for the Commission to have interpreted the term "may" as connoting mere possibility, we held that such an interpretation was inconsistent with OSHA. Pratt & Whitney Aircraft v. Secretary of Labor, 649 F.2d at 104; see Brennan v. OSHRC, 491 F.2d 1340, 1344 (2d Cir.1974) (Commission's interpretation of regulations must be consistent with enabling act); see also Insurance Company of North America v. Gee, 702 F.2d 411, 414 (2d Cir.1983) ("Regulations promulgated pursuant to rulemaking authority conferred by statute assume the force of law only to the extent consistent with the statutory scheme they were designed to implement.").
 The Supreme Court has instructed that OSHA "was not designed to require employers to provide absolutely risk-free workplaces whenever it is technologically feasible to do so." Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 641, 100 S.Ct. 2844, 2863, 65 L.Ed.2d 1010 (1980) (plurality opinion). "Rather, both the language and structure of the Act, as well as its legislative history, indicate that it was intended to require the elimination, as far as feasible, of significant risks of harm." Id.; see American Textile Manufacturers Institute, Inc. v. Donovan, 452 U.S. 490, 513 n. 32, 101 S.Ct. 2478, 2492 n. 32, 69 L.Ed.2d 185 (1981). Accordingly, the Supreme Court interpreted the Secretary's rulemaking power under section 3(8) of OSHA, 29 U.S.C. § 652(8) (1976), as limited--"before he can promulgate any permanent health or safety standard, the Secretary is required to make a threshold finding that a place of employment is unsafe--in the sense that significant risks are present and can be eliminated or lessened by a change in practices." Industrial Union Department, 448 U.S. at 642, 100 S.Ct. at 2864. Because section 1910.94(d)(7)(iii) does not incorporate a finding that common ducts present a significant risk of harm, but rather leaves that determination to the Secretary on a case-by-case basis, we adhere to our prior decision.